# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2025

Lyle W. Cayce
Clerk

No. 18-70001

Juan Carlos Alvarez,

*Petitioner—Appellant*,

*versus*

Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-3040

Before Elrod, *Chief Judge*, and Jones and Richman, *Circuit Judges*.
Edith H. Jones, *Circuit Judge*:

Twenty-six years ago, Juan Carlos Alvarez was sentenced to death for the murders of Michael Aguirre and Jose Varela. Alvarez now appeals the denial of his petition for a writ of habeas corpus challenging his state court conviction. This court granted Alvarez a Certificate of Appealability on three issues: (1) whether Alvarez was constitutionally deprived of counsel because one of his two lawyers allegedly occasionally fell asleep during his trial; (2) whether Alvarez's counsel were ineffective for not finding and offering additional mitigation evidence; and (3) whether DNA evidence processed by

No. 18-70001

the Harris County Crime lab was tainted and whether this claim is procedurally defaulted. For the reasons that follow, we AFFIRM.[1]

## I. Background

In 1998, the State of Texas charged Alvarez, a member of the Southwest Cholos gang, with capital murder for his participation in two shootings related to tensions with a rival gang, La Primera. The first shooting resulted in the murder of Michael and Adrian Aguirre at an apartment on Prestwood Street in Houston, Texas on June 6, 1998 ("the Prestwood Murders"). The second shooting involved the June 17, 1998, murder of sixteen-year-old José Varela and Hugo Perez at an apartment complex on Woodfair Street in Houston, Texas ("the Woodfair Murders"). After identifying Alvarez as the murderer, the State relied on eyewitness accounts, co-participant testimony, forensic evidence, and Alvarez's own admissions to the police to obtain his conviction and death sentence. What follows is a brief recounting of the relevant events, including what the district court described as "the overwhelming evidence of guilt" on Alvarez's part.

### *The Prestwood Murders*

On June 6, 1998, a procession of five cars full of Cholos gang members rolled up to an apartment complex frequented by members of La Primera.

---

[1] Based on the following discussion, we DENY (1) Alvarez's "*Rhines*" motions to stay and hold in abeyance this appeal pending a further attempt to bolster his "sleeping lawyer" claim and re-present his DNA testing claims to the state courts; and (2) his pending motion for funding of further investigative services. We also DENY his motion to supplement the record with the August 2019 Affidavit of Frumencio Reyes. *Shinn v. Ramirez*, 596 U.S. 366, 142 S. Ct. 1718 (2022), forecloses consideration of the affidavit in federal court. *Shinn* held that "when a federal habeas court . . . admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in [28 U.S.C.] § 2254(e)(2) are satisfied." 596 U.S. at 389, 142 S. Ct. at 1738. Alvarez does not argue that he falls under a § 2254(e)(2) exception.

No. 18-70001

After getting out of their cars, Alvarez and his fellow Cholos fired their guns into a birthday party being celebrated just outside of the complex. Several people were hit and two men, Adrian and Michael Aguirre, were killed. Several eyewitnesses testified that Alvarez was one of the shooters. Forensic examination of the crime scene identified 7.62x39mm bullet casings in the street that were fired from a firearm owned by Alvarez. And Alvarez confirmed his involvement in a statement to the police.

Among the eyewitnesses was Miguel Reyes, a fellow member of the Cholos, who affirmed that Alvarez not only participated in the Prestwood shooting but was the one who directed the whole affair. Alvarez traveled in his own car and assembled a group of other Cholos, then headed toward the scene of the murders. On their way to Prestwood, Alvarez told his fellow Cholos that they would "shoot at the guys from La Primera; at whomever." And that is what he did. Upon arriving at the apartment complex on Prestwood, Alvarez stepped out and walked to the front of the vehicle, then opened fire. Only one other gang member shot at the men. Forensic evidence confirmed Alvarez's culpability by linking the rounds fired at the apartment complex to one of Alvarez's personal firearms. Finally, during the investigation of the crime, Alvarez provided a videotaped statement to the police in which he confessed membership in the Cholos, admitted that his car was used for the shootings, and admitted that he knew his fellow Cholos would fire at a rival gang. He also admitted that his SKS was used for the drive-by though he denied firing it himself.

### The Woodfair Murders

Witness testimony and forensic evidence also tied Alvarez to the Woodfair Murders, which took place about eleven days after his Prestwood Murders.

No. 18-70001

One witness stated that on the day of the Woodfair shooting she saw Alvarez loading the rifle and shotgun used in that shooting, saw him leave his residence carrying those weapons, and then saw him return later in the evening with blood stains on his shirt. Additionally, the sister of Jose Varela, one of the murder victims, identified Alvarez as the shooter. She stated that she saw Alvarez walked up holding a shotgun, heard him yelling "Southwest Cholos, puto," and saw him firing the shotgun. She ran away. Upon her return she found her sixteen-year-old brother had died from shotgun wounds to the face and back.

During the subsequent investigation, the police recovered a 12-gauge Mossberg shotgun belonging to Alvarez from Alvarez's apartment. The barrel of the Mossberg was partly covered in blood. Upon forensic examination by the Houston Police Department Crime Lab, it was determined that some of the blood matched Jose Varela's. One of the crime lab's DNA Analysts testified to this at trial, and her testimony was later confirmed by a court-ordered re-testing during Alvarez's state habeas proceedings.

Moreover, Alvarez admitted that he and his wife drove his maroon Nissan Altima to the scene of the murder while carrying a shotgun and assault rifle. He also admitted knowledge that gang members planned to murder someone on that day, most likely a member of La Primera gang.

### The Trial

At trial, Frumencio Reyes and John L. Denninger represented Alvarez. Reyes, a well-known Houston lawyer, had been retained by the family a couple months before trial and took over first-chair from Denninger. Denninger was court-appointed counsel who had already worked on the case for at least a year. As stated by the court below, the "defense faced a daunting challenge . . . eyewitnesses had identified him as a shooter, gang members

4

pointed to him as the one who ordered the violent acts, ballistic evidence tied him to the crimes, and his own statements confirmed some involvement." Moreover, Texas's law of parties meant that Alvarez could be convicted even if he never personally fired a shot.

In the face of overwhelming evidence pointing to his guilt, defense counsel focused on attacking the credibility of the State's witnesses and calling two defense witnesses. The jury found Alvarez guilty of capital murder.

During the punishment phase, to show future danger to society, the State offered evidence of Alvarez's escalating history of violence. This included Alvarez's previous conviction for aggravated assault with a deadly weapon for which he received eight years deferred adjudication, other unadjudicated aggravated assaults, and drive-by shootings Alvarez participated in that involved at least one additional death. The State presented a record of Alvarez's gang violence, which was often random and committed with no regard for bystanders.

For its part, the defense called six witnesses. A corrections officer testified that Alvarez was quiet and did not usually cause any problems. Four family members provided testimony about Alvarez's background. Family members explained that Alvarez's family lived in Mexico until his father was murdered. The family moved to Monterrey, Mexico, and to Houston. They testified that Alvarez learned English, worked hard, provided for his family, did not use drugs, was responsible, got along well with others, and was quiet. Also discussed was how Alvarez revisited the trauma of his father's death when a friend of his was killed shortly before the murders in this case. A psychologist who testified for the defense diagnosed Alvarez's murders as a response to his friend's killing. The psychologist also said that testing he conducted revealed that Alvarez was depressed and did not handle anger

well, but Alvarez was not mentally ill. He concluded that if incarcerated, Alvarez was not a future danger to society. In spite of this mitigation evidence, Alvarez received the death penalty.

## II. Procedural Background

After Alvarez's conviction and sentencing, the trial court appointed R. P. Cornelius to represent him on direct appeal. Alvarez's appellate counsel raised thirty-nine points of error in the Texas Court of Criminal Appeals (TCCA). The TCCA affirmed Alvarez's conviction and sentence in a lengthy unpublished opinion. *Alvarez v. State*, No. 73,648 slip op. (Tex. Crim. App. Oct. 30, 2002).

While the direct appeal was pending, the trial court appointed Leslie M. Ribnik and Susan Crump, two Houston attorneys experienced in capital cases, to represent Alvarez for purposes of state habeas review. Alvarez's habeas counsel filed a state application for habeas on September 10, 2001. That application raised three grounds for relief, with a principal claim that Alvarez, a Mexican national, had been deprived of consultation with and assistance from the Mexican consulate under the Vienna Convention. Subsequently, on March 25, 2005, state habeas counsel filed a pleading captioned as a "supplemental brief."[2]

---

[2] Interplay between the trial-level court and the TCCA signaled some confusion as to whether Alvarez's supplemental brief inserted new claims into the habeas proceedings. Texas law generally limits state habeas review to the claims raised and briefed in an inmate's initial habeas application. Texas law treats pleadings filed outside a statutorily set period as a new habeas action. *See* Tex. Code Crim. Pro. art. 11.071 § 5(f). The state trial-level habeas court construed the pleading to be a successive state habeas application and forwarded it to the TCCA. The TCCA eventually clarified that the supplemental brief was only an addendum to the initial habeas application: "[T]he document does not assert additional claims, nor does it expand upon a claim already raised. Therefore, the trial court erred in declaring the document a subsequent application. The argument and authorities raised in the document should be considered, to the extent they are appropriate, in

No. 18-70001

In October 2006, Ribnik notified the court that he had to withdraw because he had developed a serious medical condition. After Ribnik's withdrawal, Robert L. McGlasson took up the mantle. As Alvarez's new habeas counsel, McGlasson filed a lengthy Reply (following the State's briefing opposed to habeas) in Support of Application for Writ of Habeas Corpus. The reply sought to "provide further evidentiary support for the legal claims raised in Mr. Alvarez's application for a writ of habeas corpus." Elaborating on his claims, Alvarez tried to show that virtually every facet of his legal representation had been marred by ineffective-assistance-of-trial-counsel ("IATC") ultimately caused by the violation of the Vienna Convention.

The state trial court entered proposed findings of fact and conclusions of law rejecting habeas relief in May 2008. In so doing, it discussed extensively the claims raised in both the initial habeas application and the arguments from the supplemental briefs. In 2008, the TCCA adopted most of the findings and conclusions and denied state habeas relief. *Ex parte Alvarez*, WR-No. 62,426-01, 2008 WL 4357801 (Tex. Crim. App. Sept. 24, 2008) (unpublished). The TCCA did not, however, adopt specific findings or conclusions related to ineffective assistance of trial counsel. *Id.* In regard to ineffectiveness issues, the TCCA stated only that the habeas court's findings "relate to arguments rather than new claims." *Id.*

Alvarez timely sought federal habeas relief in 2008. But in 2010, he successfully persuaded the federal district court to stay its hand pending state court exhaustion of claims concerning the Houston Crime Lab's forensic evidence. In this second state habeas proceeding, Alvarez alleged a *Brady* violation concerning the Crime Lab's analysis of blood samples offered at

---

conjunction with the claim already before the trial court." *Ex parte Alvarez*, No. WR-62,426-01 (Tex. Crim. App. June 6, 2007).

trial, and he alleged misconduct by Crime Lab personnel and the prosecutors for their introduction of "tainted" and "sloppy" DNA evidence at trial. The TCCA dismissed the application as an abuse of the writ, and therefore procedurally barred. *Ex parte Alvarez*, WR-No. 62,426-02, 2010 WL 3572246 (Tex. Crim. App. Sept. 15, 2010).

Counsel amended Alvarez's federal petition in 2011 to assert twenty-two claims, which the State answered. But he then obtained another stay of federal proceedings to file a third state habeas petition. Rather than file the state petition expeditiously, counsel unsuccessfully pursued litigation in state court to obtain investigation fees for the third writ. In 2014, counsel finally sought state habeas relief on the ground that trial counsel was ineffective and Alvarez was constitutionally deprived of counsel because Reyes slept during parts of the trial.[3] The TCCA dismissed this successive habeas application for abuse of the writ. *See Ex parte Alvarez*, WR-No. 62,426-04, 2015 WL 1955072 (Tex. Crim. App. April 29, 2015).

In 2017, nearly a decade after the federal habeas case commenced, the district court denied Alvarez all relief in an exhaustive 78-page opinion. The district court also denied his requests for investigation funds and for a certificate of appealability.

Alvarez then appealed, filed his motion for a COA on June 20, 2018, and briefed the district court's order denying federal funding. These matters were thoroughly briefed by both parties.

A year later, on August 22, 2019, Alvarez moved to supplement the appellate record, and/or remand to the district court, and stay or abate the federal court proceedings so he could pursue "new" claims in state court. In

---

[3] This application was supported by reference to two juror affidavits that had been signed in 2008 and offered during Alvarez's initial state habeas proceedings.

truth, his Sixth Amendment claim was not "new" but had allegedly been made stronger by an affidavit counsel had obtained only three days earlier (August 19, 2019) from trial counsel Frumencio Reyes. Although Reyes had filed three affidavits earlier in the habeas proceedings that never mentioned his physical state, he now attested that he might have been unable to participate fully in the trial, and he might have slept during some of the proceedings since he was recovering from a hospital stay that occurred shortly before the capital trial. Fortuitously, Reyes's co-counsel Denninger died in 2011 and was no longer available to opine about this claim.[4] The state vigorously opposed this motion. We denied the motion to supplement the record.

This court granted a COA on the three claims raised by Alvarez (a "sleeping lawyer" claim, a *Wiggins* claim, and claims regarding the Houston Crime Lab), carried the motion to expand the record with the case, ordered supplemental briefing, and held oral argument. Having done so, we conclude that the claims fail.

## III. Standard of Review

When reviewing a district court's denial of a writ of habeas corpus, the court reviews its conclusions of law *de novo* and its factual findings for clear error. *See Broadnax v. Lumpkin*, 987 F.3d 400, 406 (5th Cir. 2021), *cert. denied,* 142 S. Ct. 859 (2022) (citation omitted).

---

[4] Attorney Reyes himself passed away in 2023, while this appeal was under submission.

No. 18-70001

## IV. Analysis

*Deprivation of Counsel Claim*

For his "sleeping lawyer" claim, Alvarez asserts that because one of his two trial counsel slept during the trial,[5] he is entitled to relief under the Sixth Amendment, *Strickland*, and *Cronic*. We disagree.

As an initial matter, the parties debated in supplemental briefing to this court whether we are bound by the strict standards of review under AEDPA or must adopt *de novo* review. The district court found the sleeping lawyer claim deficient under either standard. But the district court also ably explained why it concluded that the sleeping-lawyer claim was actually adjudicated by the state courts on the merits and was not dismissed by the state courts on procedural grounds. *See Alvarez v. Davis*, No. 4:09–CV–3040, 2017 WL 4844570, at *24–26 (S.D. Tex. Oct. 25, 2015). We need not recapitulate its reasoning. The upshot is that although neither the state habeas trial court nor the TCCA mentioned the sleeping-lawyer claims expressly in their respective rulings, the juror affidavits were before those courts, and we conclude that those rulings were on the merits. We are guided by the Supreme Court's decision in *Johnson v. Williams*, 568 U.S. 289, 133 S. Ct. 1088 (2013), in which a state court had ruled against the defendant in an opinion that addressed some issues but did not expressly address the federal claim in question. The Court held that in such a situation, it must be presumed, subject to rebuttal, that the state court adjudicated the federal claim on the merits. *Id.* at 292–93, 133 S. Ct. at 1091–92.[6] This court recently applied *Williams* in the *Jimenez* case, in which we emphasized both (1) the application of the presumption even in cases where the state courts addressed

---

[5] *See* Affidavit of Juror Joseph Millspaugh; Affidavit of Juror Carol Frierson.

[6] *Williams,* in turn, relied on the Supreme Court's earlier precedent in *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770 (2011).

10

some but not all claims raised by a habeas petitioner and (2) the heavy burden that a petitioner bears to overcome the *Williams* presumption. *Jimenez v. Guerrero*, 133 F.4th 483 (5th Cir. 2025). Alvarez has neither attempted nor made a persuasive rebuttal of the *Williams/Jimenez* presumption in this case. Consequently, there is no indication that the state courts did not adjudicate the sleeping-lawyer claim on the merits, and it is subject to review under AEDPA.

1. No "unreasonable" application of clearly established Federal law. 28 U.S.C. § 2254(d)(1).

Under AEDPA, a state conviction can be overturned by federal habeas courts only if the state court's decision was "contrary to, or involved an unreasonable application of, *clearly established Federal law, as determined by the Supreme Court of the United States . . . .*" 28 U.S.C. § 2254(d)(1) (emphasis added), or if the state court decision amounted to an unreasonable application of the facts to the law. *Id.* § 2254(d)(2); *Harrington v. Richter*, 562 U.S. 86, 100, 131 S. Ct. 770, 785 (2011). Drawing from this court's recent discussion in *Jimenez*, 133 F.4th at 492, the "unreasonable application" of Supreme Court law "requires a prisoner to show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118, 141 S. Ct. 517, 523 (2020) (per curiam) (quotations omitted). "Rather, the [AEDPA] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was 'well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Langley v. Prince*, 926 F.3d 145, 156 (5th Cir. 2019) (en banc) (quoting *Shoop v. Hill*, 586 U.S. 45, 48, 139 S. Ct. 504, 506 (2019) (per curiam)). And as *Jimenez* further reasoned, "[i]t must be '"beyond the realm of possibility that a fairminded jurist could" agree with the state court.'" *Jimenez*, 133 F.4th at 492 (quoting *Langley*, 926 F.3d at 156)). These strong commands of deference to state courts' interpretations of

governing Supreme Court law derive from the Supreme Court's explanation that under AEDPA, "the writ of habeas corpus serves only as a 'guard against extreme malfunctions in the state criminal justice systems' and not as a 'substitute for ordinary error correction through appeal.'" *Jimenez*, 133 F.4th at 491 (quoting *Richter*, 562 U.S. at 102–03, 131 S. Ct. at 786).

Our dissenting colleague asserts that the Supreme Court "recently reminded us that '[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of th[e Supreme] Court.'" *See post*, at 41–42 (RICHMAN, J., dissenting) (citing *Andrew v. White*, 145 S. Ct. 75, 82 (2025)). Nothing in *Andrew*, however, supports the legal proposition that the dissent would apply here. In *Andrew*, the Supreme Court relied on its "clearly established" rule, a "holding" under AEDPA, that a violation of the Due Process clause may occur from the introduction of evidence that is unduly prejudicial to the defense. *Id.* at 81. The specific issue in *Andrew* was whether certain evidence prejudicial to the capital defendant violated this "holding." The "holding," in turn, was directly related to the evidentiary issue presented to the courts. *Andrew* is inapposite on the facts and the precise legal issue before the Court.

Unfortunately for Alvarez and the dissent, there is *no* clearly established Supreme Court law holding that a defendant was subjected to a violation of the Sixth Amendment where one counsel allegedly performed defectively but a second, engaged attorney effectively participated in representing the defendant. The dissent cites no case because there is none even remotely on point. Merely incanting a general supposition that counsel's *absence* during a *critical stage* of the proceedings constitutes a *denial* of constitutionally effective counsel is not enough under AEDPA. Indeed, relying on the governing Supreme Court cases, two panels of this court have held there cannot be constitutionally inadequate counsel when two attorneys represent a defendant and the effectiveness of only one is attacked. *See*

*McFarland v. Lumpkin*, 26 F.4th 314 (5th Cir. 2022); *Hall v. Thaler*, 504 F.Appx. 269 (5th Cir. 2012). And as will be seen, even if there were such "clearly established law," there is no basis for its application on the barebones claims about the trial here.

> A. (i) No *Strickland* ineffectiveness.

This court must initially decide whether the TCCA's rejection of Alvarez's sleeping lawyer claim "unreasonably applied" *Strickland*. The *Strickland* test for constitutionally ineffective counsel includes two requirements, that (a) counsel's performance fell below a standard of professionally reasonable conduct, and (b) counsel's inadequacy "prejudiced" the defense, resulting in a verdict that is not "reliable." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

We hold that the TCCA did not unreasonably apply *Strickland*. Initially, as will be discussed further below, there is nothing in the state court records about counsel's having slept during the trial other than the two juror affidavits executed almost a decade post-trial.[7] A petitioner has the burden to prove counsel's ineffectiveness, *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997), yet there is no basis in the record to show how Reyes's sleeping interfered with his performance at trial. It is merely conjecture by the dissent that Reyes may not have handled numerous witnesses and cross-examinations effectively. The dissent argues for pages on the supposed meaning of a total of five paragraphs in two juror affidavits. These affidavits are notably vague about the facts. And they are implicitly contradicted by three affidavits of counsel Reyes, executed during the state proceedings, that

---

[7] In *McFarland*, by contrast, the state court record revealed that the judge had admonished counsel during trial about his sleeping. 163 S.W.3d at 751. Similarly, in *Burdine*, the state habeas court determined that the trial judge and several others watched the sole counsel for the defendant sleeping through large portions of trial. 262 F.3d at 339–40.

said not a word about his own "incompetence" to try the case. In fact, in a notable pretrial conference, the trial judge complimented Mr. Reyes, when Reyes claimed, "They [opposing counsel] took advantage of it while I was outside, too, Judge." The court responded, "Nobody takes advantage of you, Reyes."[8]

Further, Alvarez's attempt to demonstrate constitutional incompetence on the part of co-counsel Denninger is perfunctory and without record support. Denninger conducted about half of the juror voir dires, crossed and directly examined a number of witnesses, gave one of the two closing arguments, and frequently interjected at trial with objections and clarifications. The TCCA could therefore have reasonably concluded that Alvarez did not bear his burden to prove ineffectiveness of counsel overall. *Cf. Wright v. Van Patten*, 552 U.S. 120, 125–26, 128 S. Ct. 743, 746–47 (2008); *McFarland*, 163 S.W.3d at 753–55.

As for prejudice, that, too, is implied only from two jurors' lay opinions, not proof, that counsel for Alvarez did not mount a serious defense because of Reyes's sleeping.[9] The state court could reasonably have

---

[8] A broader look at this colloquy also challenges the dissent's hypothesis that counsel Denninger was not doing his job, as Denninger was objecting to the introduction of allegedly prejudicial photographs of a crime scene. Denninger noted that he was not trying to double-team the prosecution, but they had done it first. Then Reyes became involved. 19 RR:137-38.

[9] In concluding that Reyes's sleeping automatically prejudiced Alvarez, the dissent neither identifies a single question that Reyes should have asked on cross-examination nor illustrates how those questions could outweigh the overwhelming evidence against Alvarez at both the guilt and punishment phase. In past cases, when habeas petitioners could not articulate a question that should have been asked, that omission weighed heavily against the habeas petitioner. *See Jenkins v. Vannoy*, 2018 WL 11301544, at *2 (5th Cir. Nov. 21, 2018) (denying certificate of appealability on Strickland claim where defendant did not "explain what additional questions about his arrest counsel should have asked officers"); *United States v. Tucker*, 12 F.4th 804, 818 (D.C. Cir. 2021) (denying federal post-conviction

determined that the record was insufficient to show prejudice pursuant to *Strickland*. As the district court held, the TCCA did not unreasonably reject Alvarez's *Strickland* claim.

(ii) No "unreasonable determination" of the facts in light of the evidence. 28 U.S.C. § 2254(d)(2).

Alvarez does not specifically refer to this AEDPA provision, which denies federal habeas relief unless the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State proceeding." 28 U.S.C. § 2254(d)(2). Instead, he simply assumes that two juror affidavits, filed late in state proceedings and untested in an adversary hearing, establish that Reyes slept during large portions of the trial, and Reyes was thereby disabled from serving as lead counsel.

But the dissent parlays the juror affidavits into a frontal attack on the state courts' implicit findings. In reality, only two or three paragraphs in each affidavit focus on lead counsel's alleged sleeping. Read *in toto*, the affidavits spend considerably more space emphasizing the overall strength of the prosecution case against what the jurors viewed as the lack of energy and less impressive performance of defense counsel. The dissent recites the operative paragraphs of each affidavit over and over as if repetition will increase their credibility. The dissent assays the entire trial record and purports to find that Reyes had by far the greatest trial responsibility, but that Reyes somehow was unable to perform his duties notwithstanding that he examined on direct- and cross-examination a couple dozen witnesses. The dissent claims that the State "had the opportunity" but didn't offer contrary affidavits. Two answers are appropriate. First, the state does not bear the burden of proof. Second, counsel Denninger's testimony would have been

---

relief where the defendant "identifies no question his attorney should have asked that would have impeached [a government witness] or exculpated [the defendant]").

the most effective proof of Reyes's alleged incompetence, but Alvarez offered no affidavit from him while he was alive.

The problem is that these factual suppositions conflict with the implicit contrary findings of the TCCA and AEDPA's mandate that if the state courts did not "unreasonably" determine the facts, Alvarez cannot succeed. Neither Alvarez nor the dissent makes any attempt to demonstrate by "clear and convincing evidence" that the presumption of correctness attaching to TCCA's factfindings is overcome. 28 U.S.C. § 2254(e)(1). The record here shows that the state court's factual determinations were not unreasonable.

To begin, neither Alvarez nor the dissent overcomes the inconvenient fact that another defense lawyer also participated actively in the trial and indeed had been involved in representing Alvarez for over a year before trial, far longer than Attorney Reyes. In addition, we and the district court have reviewed the trial record and found that Attorney Denninger was present at all times and "made various objections, questioned experts on voir dire, cross-examined witnesses, and argued before the jury." Denninger was fully engaged in the case. The trial court record nowhere indicates that the trial judge admonished Reyes about sleeping or had to wake him up or encouraged him to pay attention; there is nothing on the face of the trial court record suggesting that Reyes slept. In fact, as noted above, during a lengthy pretrial conference handled by both Reyes and Denninger several weeks before trial commenced, the trial judge appeared to compliment Attorney Reyes, as he said, "[no]body takes advantage of you, Reyes."

Looking to events post-trial, Alvarez's direct appeal raised thirty-nine issues, none of which bore on counsel's somnolence. His initial habeas petition was filed by two accomplished capital defense attorneys, and they never alluded to constitutionally inadequate, much less "absent" defense

counsel. Attorney Reyes himself authored affidavits during the state habeas proceedings, which covered numerous aspects of his representation of Alvarez. But neither affidavit even hinted that he had been infirm during the trial. To be sure, the two jurors' affidavits impugn Reyes for sleeping repeatedly, but there are no other affidavits, from jurors or court personnel, corroborating them. Importantly, Attorney Denninger never filed an affidavit concerning the case.[10] It is bold for the dissent to exhibit such assurance, based on this inconclusive record, that Reyes was "absent during a critical stage"—despite the fact that he examined or cross-examined many witnesses—and that Denninger's constant presence did nothing to enhance the representation.[11] It is even bolder to contradict both the district court's evaluation of the evidence, which we review for clear error, and the TCCA's implicit findings. *Higgins v. Cain*, 720 F.3d 255, 260 (5th Cir. 2013).

The dissent makes much of the TCCA's decision not to adopt the trial court's findings of fact and conclusions of law regarding ineffective assistance of counsel. *See Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sept. 24, 2008) (per curiam) (unpublished). But the TCCA's explanation merely stated that those findings "relate to arguments rather than new claims." *Id.* And it must be remembered that Alvarez had raised literally dozens of complaints about trial counsel's

---

[10] Conveniently for Alvarez's later contentions, Denninger died in 2011, three years after the juror affidavits were entered in the state court record, but eight years *before* Reyes filed the 2019 affidavit in which he fell on his sword and suggested he "might have" slept during parts of the trial.

[11] The dissent purports to reinforce its conclusion, that Alvarez was "denied" counsel who was allegedly sleeping before conducting cross-examination, with a court rule or custom that only one attorney for each side can examine a witness. That is fine, but it is only supposition that counsel Denninger sat like a bump on a log and never proposed questions for cross on Reyes's witnesses. Alvarez never asserts as much, because Alvarez's briefing is bereft of any specifics about the alleged sleeping other than the suspiciously similar, decade-old affidavits.

performance. It is a stretch to infer that the TCCA's refusal to adopt the habeas court's rejection of those dozens of "arguments" implies that the TCCA harbored doubts about the singular issue whether Reyes was sleeping during any "critical" portion of the trial.

Alvarez had the obligation to prove the "unreasonableness" of the TCCA's implicit factfindings under AEDPA. Alvarez never made his proof.

B. No *Cronic* Claim

The dissent also suggests, without conclusively resolving, that according to *United States v. Cronic*, 446 U.S. 648, 104 S. Ct. 2039 (1984), counsel's alleged sleeping was so severe as to constitute a constructive denial of effective counsel pursuant to the Sixth Amendment and therefore a violation for which no showing of prejudice is required. While it expresses uncertainty about the issue, the dissent worries that the state court might have unreasonably failed to apply *Cronic*. We disagree that the holding of *Cronic* is even potentially applicable to this case.

The dissent begins with its historical recitation of cases concerning counsel's "absence" during critical portions of trial. None of these deals with cases in which only one of two counsel is alleged to have been absent. Instead, the dissent starts with *Holloway v. Arkansas*, 435 U.S. 475, 489, 98 S. Ct. 1173, 1181 (1978). *Holloway* concerned conflicted counsel, not "absent" counsel, and its operative language discusses situations where a defendant is "deprived of the assistance of *his attorney....*" *Id.* Not *two* attorneys. Nonetheless, the dissents builds on this "holding" by citing other cases, including *Cronic*, that are all factually different from Alvarez's.[12]

---

[12] *Geders v. United States*, 425 U.S. 80, 96 S. Ct. 1330 (1976); *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843 (2002); *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55 (1932); *Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457 (1942); *Satterwhite v. Texas*, 486 U.S. 249, 108 S. Ct. 1792 (1988).

No. 18-70001

Unsurprisingly, the Supreme Court has previously confronted the intersection of *Cronic* and *Strickland* Sixth Amendment claims in the AEDPA context. In *Wright v. Van Patten*, 552 U.S. 120, 128 S. Ct. 743 (2008) (per curiam), a unanimous Court reversed the Seventh Circuit's grant of habeas where a lawyer had participated in his client's state court plea hearing only by telephone, leaving the defendant to stand alone before the judge. *Van Patten v. Deppisch*, 434 F.3d 1038 (7th Cir. 2006). The appeals court held that the state court's rejection of the petitioner's *Cronic* claim was an unreasonable application of *Cronic*'s clearly established principle: that counsel's "absence" was so deleterious to the defendant's rights as to require an automatic grant of relief without further inquiry into counsel's performance. *Id.* at 1042–43. The Supreme Court admonished that "[n]o decision of this Court, however, squarely addresses the issue . . . , or clearly establishes that *Cronic* should replace *Strickland* in this novel factual context." *Van Patten*, 552 U.S. at 125, 128 S. Ct. at 746. The Court added, "[e]ven if we agree with Van Patten that a lawyer physically present will tend to perform better than one on the phone, it does not necessarily follow that mere telephone contact amounted to total absence or prevented [counsel] from assisting the accused, so as to entail application of *Cronic.*" *Id.* (internal quotations omitted). Justice Stevens concurred in the judgment, emphasizing that *Cronic* did not cover a case involving counsel's absence only from open court, and he agreed that under AEDPA, the question is "whether the Wisconsin court's narrower reading of [*Cronic* than that of the federal appeals court] was 'objectively unreasonable.'" *Id.* at 128, 128 S. Ct. at 748 (citing *Williams v. Taylor*, 529 U.S. 362, 409, 120 S. Ct. 1495 (2000)). It was not. Hence, "[b]ecause our cases give no clear answer to the question presented," the Supreme Court unanimously concluded that the state court did not unreasonably apply clearly established Federal law. *Id.* at 126, 128 S. Ct. at 747.

19

No. 18-70001

The Supreme Court has not spoken about the intersection of *Cronic* and *Strickland* following *Van Patten*. Nor has the Court found any *Cronic* violation since *Van Patten*. Nor has the Court confronted a case where one co-counsel allegedly slept during parts of the trial, while the other co-counsel fully participated in the trial as well. The Court has not held that *Cronic* must replace *Strickland* analysis where one of two co-counsels is interstitially "absent" from trial. In sum, the instant case does not meaningfully differ from *Van Patten*. [13]

Consequently, there is no basis under AEDPA for this court to rule in this also novel context that *Cronic*'s "holding" applies where two counsel represented the petitioner, and only one became "absent." To expand on this point, *Cronic* was embellished by *Bell v. Cone*, 535 U.S. 685, 697, 122 S. Ct. 1843, 1851 (2002), which noted three circumstances in which prejudice is presumed, and counsel's "failure must be complete": first, the complete denial of counsel "at a critical stage;" second, if counsel entirely fails to subject the prosecutor's case to meaningful adversary testing; third, where counsel is called on to represent a client under circumstances where competent counsel likely could not. *Id.* at 695, 122 S. Ct. at 1850. As the district court found, Alvarez was not "denied" counsel, because he had two lawyers, at least one of whom was entirely at his service throughout the trial. Neither counsel utterly failed to meaningfully test the prosecution's case with evidence and cross-examination. The face of the trial record reveals no lapse in counsel's trial conduct. And as the next section of this opinion demonstrates, the two counsel for Alvarez were not constitutionally

---

[13] In fact, to extend *Cronic* to a "holding" that a "denial" of counsel under the Sixth Amendment includes a "denial" of part of the defense team also transgresses the *Teague* doctrine, *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989), which is incorporated in AEDPA. *See Horn v. Banks*, 536 U.S. 266, 272, 122 S. Ct. 2147, 2151 (2002).

No. 18-70001

ineffective in their preparation for and handling of his mitigation defense. The third *Bell* circumstance does not apply.[14]   The TCCA did not "unreasonably" fail to follow *Cronic* or *Bell* on these facts.[15]

*Whether to remand to state court*

The dissent contends that this court ought to grant Alvarez's motion to remand to state court to consider Attorney Reyes's affidavit, which as noted above was not filed until this appeal was pending—*i.e.,* nearly twenty years after Alvarez's conviction, and numerous state court and federal district court rulings.  This request is untimely. Nothing prevented Reyes from acknowledging earlier that he "might have" "sometimes" fallen asleep during the trial, such as when he filed previous affidavits in this case. As the

---

[14] Reinforcing the inapplicability, or at least debatability, of *Cronic,* the TCCA itself found *Cronic* inapplicable where two lawyers represented the defendant and one was allegedly sleeping during trial, in a decision that preceded its denial of Alvarez's petition. *Ex Parte McFarland*, 163 S.W.3d 743, 753 (Tex. Crim. App. 2005).  This court has twice rejected a *Cronic* claim where two counsel represented the petitioner.  *McFarland v. Lumpkin*, 26 F.4th 314 (5th Cir. 2022); *Hall v. Thaler*, 504 F. App'x 269, 277–78 (5th Cir. 2012).  In *McFarland*, the court noted that it was "aware of no case where a sleeping co-counsel alone triggers *Cronic*'s presumption of prejudice."  26 F.4th at 320.  Because the petitioner in *McFarland* had "enjoyed effective assistance by [co-counsel]," the court concluded that the state court decision was "not contrary to or an unreasonable application of clearly established Supreme Court precedent."  *Id. McFarland*, as well as *Hall*, cannot supplant clearly established Federal law of the Supreme Court under AEDPA.  But their reasoning demonstrates at least that reasonable jurists could differ about the scope of *Cronic*, proving that the state court here did not "blunder so badly that every fairminded jurist would disagree" with its decision.  *Mays v. Hines*, 592 U.S. 385, 392, 141 S. Ct. 1145, 1149 (2021) (per curiam).

[15] That this court and others cited by the dissent have affirmed the application of *Cronic* in "sleeping lawyer" cases is not legally relevant to AEDPA. *But see Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (en banc); *United States v. Ragin*, 820 F.3d 609, (4th Cir. 2016); *Muniz v. Smith*, 647 F.3d 619, 621 (6th Cir. 2011); *Tippins v. Walker*, 77 F.3d 682 (2d Cir. 1996); *Javor v. United States*, 724 F.2d 831, 834–35 (9th Cir. 1984).  Even if they were relevant, however, in none of these cases did two counsel represent the defendant.

dissent says, he admits that he was "previously untruthful" in denying that he slept. There is simply no plausible excuse for a capital defendant's trial counsel to wait for decades and then suddenly admit to possible constitutional ineffectiveness. To stay our consideration of this appeal and remand to the state courts for further consideration would mock the Supreme Court's holding in *Rhines v. Weber*, 544 U.S. 269, 277–78, 125 S. Ct. 1528, 1534–35 (2005), which noted that any such exercise of our discretion must take account of AEDPA's intent to streamline federal habeas corpus proceedings. Alvarez presents no new, unexhausted *claim*, which was the subject of *Rhines*, but only additional *evidence* that purportedly supports the two juror affidavits. New evidence that could have been obtained with due diligence as soon as the trial was ended cannot fall within *Rhines*.[16] Indeed, because Alvarez bore the burden to prove his claim about counsel's sleeping, the best evidence would have been an affidavit from co-counsel Denninger — but Alvarez made little of this claim until after Denninger died. To stay consideration of this matter in the federal courts would constitute an abuse of our discretion.

*The Wiggins Claim*

Alvarez frames another ineffective assistance of trial counsel claim around *Wiggins* and the recent Supreme Court decision in *Andrus*. *See*

---

[16] The same result obtains even if *Rhines* applies to unexhausted evidence, as well as unexhausted claims, as at least one court has held. *See Gonzalez v. Wong*, 667 F.3d 965, 977–86 (9th Cir. 2011). *Gonzalez* suggested that unexhausted evidence might merit a stay if a petitioner has good cause for failing to present the evidence earlier and has a potentially meritorious claim. Not only could Alvarez have obtained the affidavit with due diligence, but also the affidavit does nothing to undermine that Alvarez had a second attorney whose effectiveness was not credibly challenged. In other words, Alvarez both lacks good cause for not presenting this affidavit at an earlier stage of litigation and cannot plausibly argue that the affidavit renders his claim meritorious. Thus, even if we assume, without deciding, that *Gonzalez* is correct, that case does not render a stay appropriate here.

No. 18-70001

*Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003) (inadequate investigation of mitigation evidence can violate Sixth Amendment right to effective assistance of counsel); *Andrus v. Texas*, 590 U.S. 806, 140 S. Ct. 1875 (2020) (failure to provide known, existing, and easily discovered mitigation evidence during a trial's punishment phase can violate the Sixth Amendment). In support of his claim, Alvarez asserts that trial counsel failed to investigate his personal history and mental deficiencies deeply enough and failed to present sufficiently detailed mitigating evidence during the punishment phase of his trial. Therefore, Alvarez argues, his counsel were constitutionally ineffective under *Strickland*, *Wiggins*, and *Andrus*.

As a threshold question, the parties here debate what standard of review applies to this claim in federal court due to the procedural complexities that evolved in the state habeas proceedings. The district court addressed the uncertainty by review under both the "doubly deferential" standard required by AEDPA, *Richter*, 562 U.S. at 101, 131 S. Ct. at 785, as well as the *de novo* standard applicable to *Strickland* claims of ineffective assistance. Even under the more lenient standard, the *Wiggins* claim is unavailing.[17]

Under *de novo* review, to establish that his counsel performed ineffectively, Alvarez must demonstrate both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. A failure to establish either

---

[17] As the district court concluded, Alvarez conceded that his *Wiggins* claim was fairly presented and exhausted in state court. *Alvarez v. Davis*, 2017 WL 4844570, at *25 (S.D. Tex. Oct. 25, 2017). That would mean AEDPA bars relitigation of the claim unless the state court's adjudication was contrary to or unreasonably applied governing Supreme Court precedent. Because Alvarez belatedly parries this concession by invoking the alleged incompetence of his state habeas counsel, we act out of prudence in assessing this claim pursuant to the non-AEDPA-constrained *Strickland* standard.

23

deficient performance or prejudice makes it unnecessary to examine the other prong. *Id.* at 697, 104 S. Ct. at 1069. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010).

A claim for ineffectiveness at the sentencing stage of a capital trial requires proof that counsel failed in their duty to "discover all reasonably available mitigating evidence," "or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 523-24, 123 S. Ct. 2527, 2536–37 (2003). In this case, Alvarez asserts that counsel failed to investigate and offer mitigating evidence that Alvarez (1) suffers from organic brain damage and PTSD, (2) experienced poverty, loss of loved ones, violence and terror, (3) has a good character, and (4) has extenuating reasons for gang involvement. As will be seen, these claims, which merely accuse trial counsel of just not doing "enough," are approached warily by this court. *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The court must give trial counsels' judgments "a heavy measure of deference" on review. *Wiggins*, 539 U.S. at 522, 123 S. Ct. at 2535; *see also United States v. Bernard*, 762 F.3d 467, 474 (5th Cir. 2014). In sum, to establish that counsel's performance was constitutionally deficient, a convicted defendant must prove that trial counsel unintentionally "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.

Even if Alvarez could show that trial counsel were deficient, such deficiencies "must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692, 104 S. Ct. at 2067. To establish such prejudice, Alvarez must show that there was a reasonable probability "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. 2068. "A reasonable probability is a probability sufficient to undermine the confidence

in the outcome." *Id.* This requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U.S. at 112, 131 S. Ct. at 792.

In support of his ineffectiveness claim regarding the penalty phase, Alvarez offers additional evidence of the types noted above and asserts generally that trial counsel failed to explore "red flags," failed to present a cohesive mitigation narrative, and failed to investigate and rebut the State's case. Alvarez likens his situation to the facts underlying *Andrus v. Texas*. *See* 590 U.S. 806, 140 S. Ct. 1875 (2020). Other than the later-decided *Andrus*, the district court addressed each of the *Wiggins* issues raised by Alvarez and demonstrated their failure on the merits. We agree with the district court that none of Alvarez's arguments have merit. Moreover, *Andrus* is inapt.

When ruling on Alvarez's "red flags" argument, the district court observed that trial counsel employed an expert psychologist for trial preparation and testimony. Dr. Laval repeatedly interacted with Alvarez before trial, interviewing him several times and administering two tests. Nothing in his interactions or testing suggested that Alvarez had any mental or psychotic disorder. As pointed out by the district court, though Alvarez now provides an affidavit in which a psychologist says it is possible that Alvarez suffers from brain damage and PTSD, the expert hired for the trial said that such conditions did not exist at the time of the murders. There is nothing in the record to suggest that Dr. Laval's expertise was unreliable at the time he provided his assistance. Because of this, the district court held that Alvarez did not prove that a reasonable trial attorney should have made a more thorough investigation into mental health issues. We agree. *Alvarez*, 2017 WL 4844570, at *30.

Regarding Alvarez's argument that trial counsel's punishment phase narrative was deficient, along with counsel's investigation into and rebuttal of the State's case against him, the district court likewise found Alvarez's

arguments unavailing. The district court points out that Alvarez's defense team was not unaware of the State's case and the evidence sustaining it. The defense team made "many trips to the Assistant District Attorney's office to review the open pending files," a fact that Alvarez conceded. *Alvarez v. Davis*, 4:09-CV-3040, 2017 WL 4844570, Doc. No. 1, Exh. 34 (S.D. Tex). Additionally, as they investigated mitigation evidence, trial counsel not only availed themselves of Dr. Laval but also, according to trial counsel's affidavit, "had numerous meetings with family members to determine the mental and emotional state of Mr. Alvarez." February 19, 2003 Affidavit of Frumencio Reyes. And trial counsel further stated under oath that he "planned the strategy of the trial with members of the family and Mr. Alvarez himself." *Id*. While Alvarez has not clarified what role he played in fashioning the defense, any review of these matters must be done in light of Alvarez's apparent choice or endorsement of the strategy. In other words, the narrative employed at trial was plotted out by Alvarez, his family, and trial counsel together, and they were all involved in developing Alvarez's mitigation case.

Finally, as the district court found, everything that Alvarez's current counsel asserts should have been provided to the jury in mitigation was adduced by trial counsel from the six witnesses who testified. The jurors were given evidence that Alvarez had witnessed fatal violence to those he loved, that this was transformative, that his childhood was unsettled by separation from his mother and several moves, that being a member of a gang gave him a sense of purpose, and that his violent lifestyle involved his unresolved feelings about his father's death. Jurors also were told that the murder of Alvarez's close friend triggered again the trauma he had suffered from his father's killing and motivated his gang violence. Dr. Laval further informed jurors that Alvarez likely would not engage in gang violence while incarcerated and was not a future threat to society. As the district court found, "the evidence presented at trial travels much the same pathways and

reaches the same end—an explanation for Alvarez's gang membership, descent into violence, and ultimate commission of the murders." *Alvarez*, 2017 WL 4844570, at *30. Alvarez provides no evidence or argument that unsettles the district court's findings.

In addition to the above arguments, Alvarez now relies on *Andrus v. Texas* to support his *Wiggins* claim. *Andrus*, however, is easily distinguished. During the punishment phase of Andrus's capital murder trial, Andrus's counsel only called as witnesses his mother and his father, who had not seen Andrus in years. *Andrus*, 590 U.S. at 807–11, 140 S. Ct. at 1878-79. After the defense rested, the court questioned Andrus's defense counsel about why he did not call more witnesses. In response, Andrus's counsel then called a doctor, a prison counselor, and (briefly) Andrus himself. *Id.* at 809–11, 140 S. Ct. at 1879. Andrus was sentenced to death. *Id.* At the ensuing state habeas hearing, Andrus offered a "tidal wave" of mitigation not presented at trial. *Id.* Andrus provided evidence that he had suffered extreme neglect, privation, violence, and abuse as a child. *Id.* at 809–11, 140 S. Ct. at 1879-80. He had struggled with mental-health issues, including "affective psychosis," hearing voices, and attempted suicide. Information bearing on all of these facts was available to defense counsel before the punishment phase of Andrus's trial. *Id.* at 811–12, 140 S. Ct. at 1880. Based on the "tidal wave" of mitigation evidence, the trial court found counsel ineffective upon consideration of Andrus's habeas petition, but the TCCA disagreed. *Id.* at 810–13, 140 S. Ct. at 1879–81. On appeal, the Supreme Court concluded that counsel was barely acquainted with the witnesses, inexcusably did not know that Andrus had attempted suicide, culpably did not know that Andrus's bad experiences in youth detention had traumatized him, failed to talk to Andrus's siblings, failed to "uncover" Andrus's obvious PTSD, and ignored Andrus's mental-health issues. *Id.* at 815–17, 140 S. Ct. at 1882–83. The Supreme Court vacated the TCCA's opinion, and remanded Andrus's case

for an evaluation of whether Andrus's counsel's ineffectiveness was prejudicial. *Id.* at 823–24, 140 S. Ct. at 1887.

Alvarez's case does not compare. Alvarez's trial counsel knew and presented information about Alvarez's personal history. Alvarez's trial counsel spent a good deal of time examining the prosecution's files, preparing the case with Alvarez and his family, obtaining and using a mental-health expert, and took "[e]very precaution . . . to protect Mr. Alvarez's statutory rights." February 19, 2003 Affidavit of Frumencio Reyes. Unlike the trial court in *Andrus*, the trial court evaluating Alvarez's state habeas petition did not find ineffective assistance of counsel. In other words, Alvarez has not presented a "tidal wave" of qualitatively different or new evidence warranting relief, and he has shown neither ineffectiveness nor prejudice on his *Wiggins* claim.

Given the district court's thorough review of the record and detailed analysis of Alvarez's *Wiggins* claim under every relevant standard, Alvarez's *Wiggins* claim fails.

*Houston Crime Lab*

Alvarez urges this court to stay and abate his federal habeas proceedings—yet again—to reassert his habeas claims based on the Houston Crime Lab's deficient DNA processes in the late 1990s and consider updates to DNA science. On this claim, however, there is no basis to abate for further state court consideration. Alvarez raised these claims in both his 2010 and 2014 state habeas petitions. The TCCA found the claims procedurally defaulted. *Ex parte Alvarez*, WR-No. 62,426-04, 2015 WL 1955072 (Tex. Crim. App. April 29, 2015); *Ex parte Alvarez*, WR-No. 62,426-02, 2010 WL 3572246 (Tex. Crim. App. Sept. 15, 2010). The claims are barred from federal court review, as the district court found. In the alternative, however, we agree with the district court that these claims are meritless, in part

No. 18-70001

because the tainted DNA tests in question were independently redone by experts on behalf of Alvarez's counsel and by court order, and those tests showed conclusively that Alvarez's Mossberg had Alvarez's 16-year-old victim's blood on its barrel. Alvarez has not been able to overcome the district court's sound finding that there was no prosecutorial misconduct. Moreover, even if there remained doubt about these forensics or about alleged prosecutorial misconduct, abundant testimony as well as his own admissions connected Alvarez to the crime, and he helped plan the shootings and provided the car and weapons. In short, the evidence, if tainted, was not material, as there is no reasonable probability that the result of the proceeding would have been different had the evidence been excluded. *See Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272-73 (2004).

For the foregoing reasons, the district court's judgment denying Alvarez's habeas petition is AFFIRMED.

No. 18-70001

Priscilla Richman, *Circuit Judge*, dissenting:

There is *unrebutted* evidence that Juan Carlos Alvarez's lead counsel at trial fell asleep, more than once, during direct examinations of witnesses counsel then cross-examined in this capital murder trial. Accordingly, (1) counsel's performance was deficient, and (2) Alvarez was effectively without counsel during those parts of the trial for reasons explained below. If prejudice is required to be shown, that showing has been made. I part company with the majority opinion, though I greatly respect and have the highest regard for my colleagues.

One of the questions we must answer is what "Federal law, as determined by the Supreme Court of the United States," was "clearly established"[1] when Alvarez was convicted in 1999.

First, *Strickland* was clearly established law. Prong one of *Strickland*'s inquiry is whether "counsel's representation fell below an objective standard of reasonableness."[2] No one contends that a lawyer's conduct is reasonable "under prevailing professional norms"[3] if he sleeps during the testimony of a witness then cross-examines that witness in a capital trial. *Strickland* also "requires showing that counsel . . . was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[4] Lead counsel's deficiencies were unreasonable under *Strickland*.

Second, the law was clearly established that if a defendant is deprived of the presence and assistance of his attorney during a critical stage of the

---

[1] 28 U.S.C. § 2254(d)(1).

[2] *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

[3] *Id*. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

[4] *Id*. at 687.

prosecution, a violation of the Sixth Amendment can occur.[5] Such a violation did occur in this case.

Assuming prejudice is not presumed under *Cronic*,[6] and must be established under *Strickland*, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[7] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[8]

First, it is virtually impossible to reconstruct what cross-examination by effective counsel would have elicited from witnesses at trial. As the majority opinion recounts, defense counsels' strategy focused on cross-examining the State's witnesses.[9] Lead counsel was responsible for cross-examining the lion's share of the State's witnesses (16 of 27 during the guilt phase of the trial, and 9 of 13 during the sentencing phase),[10] including eye witnesses.[11] Sleeping during the direct testimony of witnesses whom counsel is responsible for cross-examining undermines confidence in the outcome of the trial.

Second, there is a reasonable probability sufficient to undermine confidence that the jury would have imposed a death sentence. The spectacle

---

[5] *See, e.g.*, *Geders v. United States*, 425 U.S. 80, 91-92 (1976) (holding that when the defendant could not consult counsel "during a 17-hour overnight recess between his direct- and cross-examination," "his right to the assistance of counsel guaranteed by the Sixth Amendment" was impinged).

[6] *United States v. Cronic*, 466 U.S. 648 (1984).

[7] *Strickland*, 466 U.S. at 694.

[8] *Id.*

[9] *See ante* at 5.

[10] *See infra* notes 95, 96, 104, 105 and accompanying text.

[11] *See infra* note 97 and accompanying text.

of lead counsel sleeping during a death penalty case evidenced a profound lack of respect for the process and the gravity of the proceedings. There is a reasonable probability that it reduced the proceedings in the eyes of the jury to a pro forma exercise or a mere formality before Alvarez was sentenced to die for what were unquestionably heinous crimes. It sent the message that this defendant was so guilty, we do not have to ensure that his lawyer was actually functioning as counsel at all times during trial.

Alvarez's lead attorney fell asleep repeatedly, as two jurors have attested without contradiction. The majority opinion relies heavily on the fact that Alvarez was represented at trial by two lawyers.[12] But that analysis is fundamentally flawed. Due to trial practice in Texas only one attorney is responsible while a witness testifies, so co-counsel could not, and did not, cross-examine witnesses for whom lead counsel was responsible and could not and did not make objections during their direct testimony.[13] At a minimum, when Alvarez's lead attorney fell asleep during the direct testimony of State witnesses whom lead counsel then cross-examined, Alvarez did not have functioning counsel.

Nor can it be said that sleeping under such circumstances is a permissible strategic decision. Alvarez's Sixth Amendment right to competent, effective counsel during a critical stage of the criminal proceedings was violated.

---

[12] *See ante* at 12.

[13] *See, e.g.*, *Trial Guidelines for Attorneys*, DIST. CTS. OF HARRIS CNTY., https://www.justex.net/section/1493 [https://perma.cc/RES2-DH8D] ("When there is co-counsel, only the attorney examining or cross-examining the witness will be allowed to make objections."); *see also* 19RR:137-38 (reflecting that the state trial court judge said, "Well, I've always agreed that only one lawyer from each side has a right to make objections and not double team."). Citations to RR refer to the Reporter's Record, which is the transcript of the 1999 trial court proceedings. The digits preceding RR refer to the volume, and the digits following RR reference the page numbers.

No. 18-70001

The proceedings were also robbed of the gravity and the respect for the integrity of the process that is required when a person's life or liberty is in the balance. As one juror put it, "There was at least one occasion where the judge had to wake Mr. Reyes up by repeating his name when it was his turn to question a witness; the courtroom broke out in laughter, but I would say it was mostly nervous laughter at such a spectacle."[14] Another juror's account was similar.[15]

Allowing a death sentence to stand in these circumstances undermines not only confidence in the integrity of the trial itself but the public's confidence in the judicial system as a whole. There is unrefuted evidence that lead counsel "kept falling asleep," "[t]his was not a one-time occurrence," "it happened repeatedly throughout the trial," "[h]e would definitely fall asleep, not just a head nod; he would be out," "he would stay out for periods of several minutes, as long as five minutes or maybe even more on some occasions, two to three minutes or more on others," lead counsel "would do most of his dozing while the prosecutors were questioning their witnesses,"[16] jurors were "shocked" by lead counsel "repeatedly falling asleep during the trial" "on a number of occasions, when the State was presenting its case and witnesses," and the judge had to awaken lead counsel "when it was his turn to question a witness."[17] Sleeping episodes of these durations during critical parts of the trial for which lead counsel was responsible establish that counsel was not competent and was ineffective.

---

[14] ROA.5414 ¶ 7.

[15] *See* ROA.5409 ¶ 6 ("At some point I remember someone, maybe it was the judge, had to call out his name a couple of times to wake him up when it was his turn to question a witness after the State had presented their testimony, and the courtroom broke out in laughter.").

[16] ROA.5409 ¶¶ 6-8.

[17] ROA.5414 ¶ 7.

No. 18-70001

Tellingly, in denying habeas relief, the Texas Court of Criminal Appeals (TCCA) did not expressly find or conclude that Alvarez's trial counsel was effective. To the contrary, the TCCA expressly declined to adopt the state habeas trial court's finding that Alvarez's counsel was effective.[18] Similarly, the TCCA expressly declined to adopt the state habeas trial court's conclusion of law that Alvarez had failed to show trial counsel's performance was deficient during the penalty phase.[19]

Alvarez's Sixth Amendment right to counsel was violated, and the TCCA's resolution of the sleeping-lawyer claim was unreasonable under 28 U.S.C. §§ 2254(d)(1) and (2). I would grant habeas relief.

# I

In 1998, two gang-related shootings took place in the Houston, Texas area eleven days apart.[20] Alvarez was indicted and charged with intentionally and knowingly causing the death of three individuals during the incidents, Juan Nevarez Favela, M. Aguirre, and J. Varela.[21] Until shortly before trial, Alvarez was represented by appointed counsel, one of whom was John

---

[18] *See Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sep. 24, 2008) (not designated for publication) ("This Court has reviewed the record with respect to the allegations made by Applicant. We adopt the trial court's findings of fact and conclusions of law, except for findings # 47 through # 73 and conclusions # 14 through # 19, which relate to arguments rather than new claims. Based upon the trial court's other findings and conclusions and our own review, we deny relief."); ROA.5941-46 (state habeas trial court's findings of fact #47-73).

[19] *See Ex parte Alvarez*, 2008 WL 4357801, at *1; ROA.5951-53 (state habeas trial court's conclusions of law #14-19).

[20] 17RR:19-20 (State's guilt-phase opening statement); *see also Alvarez v. Davis*, No. 4:09-CV-3040, 2017 WL 4844570, at *1 (S.D. Tex. Oct. 25, 2017) (unpublished); ROA.3019.

[21] 17RR:19-20 (State's guilt-phase opening statement); *see also Alvarez*, 2017 WL 4844570, at *1; ROA.3019 (same).

No. 18-70001

Denninger, who was lead counsel as of mid-August 1999.[22]  Shortly before trial, Denninger's co-counsel withdrew.[23]  About two weeks before jury selection began, and five weeks before the trial commenced in September 1999, Frumencio Reyes was retained as lead counsel.[24]  Reyes had no prior connection to the case.[25]  Denninger continued as court-appointed second-chair counsel.[26]

The State prosecuted Alvarez under Texas's law of parties, which allows for conviction even if the defense could prove that Alvarez never fired a shot.[27]  At trial, the trial court stated that it was adhering to a well-understood practice in Texas courts precluding co-counsel from cross-examining jointly or participating jointly in objections when a witness testifies.[28]  The State's evidence during the guilt phase consisted of eyewitness testimony, ballistic evidence, and Alvarez's own out-of-court

---

[22] ROA.5208, 5218-19 (February 2008 supplemental reply detailing procedural history).

[23] *See* ROA.5218-19 (February 2008 supplemental reply); *see also Alvarez*, 2017 WL 4844570, at *3 & n.4; ROA.3022 & n.4 (same).  *Compare* 3RR:5 (indicating co-counsel Hards's presence during pre-trial motion hearing), *with* 5RR:17 (state trial judge introducing Reyes and Denninger as Alvarez's counsel to prospective jurors).

[24] ROA.5218-19 (February 2008 supplemental reply).

[25] *See* ROA.5220 (February 2008 supplemental reply), 5375 (Affidavit of Frumencio Reyes dated February 2008) ("I had only about five weeks to prepare between the time when I was substituted as counsel and the first day of trial.").

[26] ROA.5219 (February 2008 supplemental reply), 5374 (Aff. of Frumencio Reyes dated February 2008) ("After I joined the case, I kept [Denninger] on as second counsel.").

[27] *See* 24RR:9 (State's guilt-phase closing argument noting that "the controlling law . . . is the law of parties . . . because this defendant did not fire the fatal shots"); *see also Alvarez*, 2017 WL 4844570, at *3; ROA.3022-23 (same).  *See generally* TEX. PENAL CODE § 7.01.

[28] *See* 19RR:137-38 ("Well, I've always agreed that only one lawyer from each side has a right to make objections and not double team.").

statements.[29]   Alvarez was found guilty of all four murders.[30]   At the punishment phase, the State put on witnesses to testify to Alvarez's history of violent criminal acts.[31]   Alvarez was sentenced to death.[32]   The TCCA affirmed on direct appeal.[33]

Alvarez sought state post-conviction relief and requested an evidentiary hearing.[34]   The sleeping-lawyer claim was asserted in this initial state habeas proceeding, albeit in a concise passage of a supplemental reply brief.[35]   The claim was supported by affidavits from two jurors who saw lead counsel repeatedly sleeping during trial, including during the direct examination of witnesses whom lead counsel then cross-examined.[36]   The

---

[29] *See, e.g.*, 17RR:19-26 (State's guilt-phase opening statement); 24RR:7-21, 48-66 (State's guilt-phase closing argument summarizing evidence); *see also Alvarez*, 2017 WL 4844570, at *3; ROA.3022 (same).

[30] 24RR:70 (jury verdict); *see also Alvarez*, 2017 WL 4844570, at *1; ROA.3019 (same).

[31] 28RR:40-62 (State's penalty-phase closing argument summarizing evidence); *see also Alvarez*, 2017 WL 4844570, at *3-4; ROA.3023-25 (same).

[32] 28RR:71 (sentence).  For a more detailed discussion of the facts, see the district court's memorandum and order dated October 25, 2017, at *Alvarez*, 2017 WL 4844570, at *1-4; ROA.3019-25.

[33] *Alvarez v. State*, No. 73,648 slip op. (Tex. Crim. App. Oct. 30, 2002) (not designated for publication); ROA.4415-55 (same).

[34] ROA.4818-44 (first state application for post-conviction relief), 5190-93 (February 2008 Motion for Evidentiary Hearing), 5207 (February 2008 Motion Renewing Request for an Evidentiary Hearing); *see also Alvarez*, 2017 WL 4844570, at *4 (detailing procedural history); ROA.3025 (same).

[35] ROA.5258 (February 2008 Reply in Support of Application for Writ of Habeas Corpus and Motion Renewing Request for an Evidentiary Hearing to Resolve Controverted Material Facts).

[36] *See* ROA.5408-15.

state habeas court denied relief without an evidentiary hearing.[37]    On September 24, 2008, the TCCA affirmed, but as already noted, it expressly declined to adopt certain findings of fact and conclusions of law, including the finding that trial counsel vigorously and effectively represented Alvarez and the conclusion of law that Alvarez had been adequately represented by counsel during the punishment phase.[38]

Alvarez sought habeas relief in federal court, and on September 18, 2009, he filed his first petition,[39] which included his sleeping-lawyer claim.[40] Ultimately, the federal district court denied habeas relief in October 2017, reasoning that since Alvarez had co-counsel, he was required to show "that the times lead counsel was asleep left him without adequate representation, and that counsel's inaction in those moments harmed the defense."[41]  The district court concluded that because second-chair counsel actively participated in the trial and "Alvarez's pleadings make no effort to allege facts beyond that contained in the juror's affidavit [sic], and he has not shown the ability to do so, the state habeas court's rejection of this claim was not unreasonable."[42]  The district court decided Alvarez's sleeping-lawyer claim on the merits.  It did not conclude that the sleeping-lawyer claim was forfeited.

---

[37] ROA.5931-54 (state habeas trial court's findings of fact, conclusions of law, and order).

[38] *Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sept. 24, 2008) (not designated for publication).

[39] ROA.9-320; *see also* ROA.1746-2085 (amended petition dated April 4, 2011).

[40] ROA.111-17; *see also* ROA.1889-94 (amended petition).

[41] *Alvarez v. Davis*, No. 4:09-CV-3040, 2017 WL 4844570, at *32 (S.D. Tex. Oct. 25, 2017); ROA.3080 (same).

[42] *Alvarez*, 2017 WL 4844570, at *32; ROA.3080 (same).

No. 18-70001

Alvarez filed a notice of appeal and sought a certificate of appealability. This court granted a certificate as to three issues: the claim that Reyes slept during trial; the claim of ineffective assistance of trial counsel regarding mitigating evidence; and the claim that the Harris County Crime lab tainted DNA evidence. I consider only the sleeping-lawyer claim. I do not, however, agree that Alvarez had effective counsel in the preparation and presentation of mitigating evidence.[43] Because lead counsel's performance unquestionably was deficient and ineffective, I conclude it is unnecessary to consider the *Wiggins* claim.

## II

The majority opinion characterizes a sleeping lawyer claim as one in which counsel is allegedly "defective," concluding *Strickland* applies, as distinguished from a claim of "deprivation" of counsel at a critical stage, which at least potentially could be analyzed under *Cronic*.[44] I take issue with the conclusion that Alvarez was not deprived of counsel when his lead lawyer was sleeping. When counsel sleeps during the direct examination of a witness whom that counsel then cross-examines, the defendant is deprived of counsel. Counsel is also "defective" and ineffective. But the Sixth Amendment requires presence of counsel during critical phases of a criminal proceeding, and a sleeping lawyer cannot be present while slumbering. Regardless, whether *Strickland* or *Cronic* is the correct frame for analysis, Alvarez is entitled to relief.

I first consider the sleeping-lawyer claim under *Strickland*. Part II(A) addresses how we determine what the clearly established law was and at what level of generality law is clearly established. Part II(B) addresses whether

---

[43] *See ante* at 28.

[44] *Ante* at 18-20.

prejudice must be shown.  Part II(C) considers what the trial court record reflects regarding the sleeping lawyer's participation during the trial.  Part II(D) concludes that even if the *Strickland* paradigm applies, this court should grant habeas relief.  Part II(E) discusses the majority opinion's analysis of pertinent decisions.

I then consider the application of *Cronic* in Part III.  Part IV concludes that if habeas relief is warranted under *Cronic*, application of *Cronic* would not violate *Teague v. Lane*.[45]  Part V discusses whether the sleeping-lawyer claim was adjudicated by the state court on the merits as a procedural matter.  Finally, Part VI concludes that in the alternative to granting habeas relief, this court should grant Alvarez' motion to hold the appeal in abeyance.

## A

AEDPA provides that a federal court cannot grant habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim":

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[46]

As a threshold matter, how do we determine what is "clearly established Federal law, as determined by the Supreme Court of the United States"?

---

[45] 489 U.S. 288 (1989).

[46] 28 U.S.C. § 2254(d).

No. 18-70001

The majority opinion is not clear as to what it considers to be the clearly established law in 1999,[47] when Alvarez was convicted, regarding (1) whether lead trial counsel's performance was ineffective under *Strickland*, and (2) showing prejudice under *Strickland*. The majority opinion seems to ground its resolution as to both of these prongs on the basis that Alvarez had two lawyers at trial. During its discussion of "the intersection of *Cronic* and *Strickland*," the majority opinion says, "Nor has the [Supreme] Court confronted a case where one co-counsel allegedly slept during parts of the trial, while the other co-counsel fully participated in the trial as well."[48] To the extent that the majority opinion concludes that the law was not clearly established that if a defendant has two lawyers, deficient conduct by one lawyer can prejudice the defendant, I disagree.

As will be discussed in more detail below, the law was clearly established in 1999 that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital case,"[49] the Sixth Amendment is violated.[50] It was also clearly established in 1999 that if the requisite degree of prejudice is shown, at the very least, reversal is required under *Strickland*.[51]

---

[47] *Ante* at 11-12.

[48] *Ante* at 20.

[49] *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)).

[50] *See id.*; *see also Geders v. United States*, 425 U.S. 80, 91-92 (1976).

[51] *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (stating that a "convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components," one of which is that "the defendant must show that the deficient performance prejudiced the defense").

No. 18-70001

The Supreme Court recently reminded us in *Andrew v. White*[52] that "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of [the Supreme] Court."[53] Indeed, "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."[54] "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"[55]

A careful examination of *Andrew v. White* is illuminating and instructive. Andrew, a woman, had been sentenced to death in state court for conspiring with her lover to kill her estranged husband.[56] The prosecutor presented a considerable amount of evidence about her sex life, affairs she had in college, her thong underclothing, whether she was a good mother, and how she dressed in public, most of which the State had conceded on appeal was irrelevant.[57] The Supreme Court held that "By the time of Andrew's trial, this Court had made clear that when 'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.'"[58] The decision the Supreme Court cited for that holding, in the

---

[52] 604 U.S. 86 (2025).

[53] *Id.* at 94.

[54] *Id.* at 95 (quoting *White v. Woodall*, 572 U.S. 415, 427 (2014)).

[55] *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (KENNEDY, J., concurring in judgment)).

[56] *Andrew*, 604 U.S. at 88.

[57] *Id.* at 88-90.

[58] *Id.* at 88 (quoting *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

opening paragraph of its opinion, was *Payne v. Tennessee*.[59]  Yet, the *Payne* case was not factually similar to *Andrew*.

The main issue in *Payne* was whether "the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial."[60]  In holding the answer was "no," and overruling prior precedent, the Court said "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."[61] The Supreme Court held in *Andrew* that this statement was a "holding[], as opposed to the dicta," for purposes of determining clearly established law under AEDPA.[62]

In *Andrew*, the Court reasoned that the statement in *Payne* was a "holding" because "the Court removed one protection for capital defendants (the per se bar on victim impact statements) in part because another protection (the Due Process Clause) remained available against evidence that is so unduly prejudicial that it renders the trial fundamentally unfair."[63]  "The legal principle on which Andrew[, the condemned defendant,] relies, that the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial, was

---

[59] *Id.* (citing *Payne*, 501 U.S. at 808 ).

[60] *Payne*, 501 U.S. at 811; *see id.* ("In this case we reconsider our holdings in *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989), that the Eighth Amendment bars the admission of victim impact evidence during the penalty phase of a capital trial."); *see also Andrew*, 604 U.S. at 81 ("In *Payne*, this Court considered whether to overrule a set of prior cases that had categorically barred the introduction of victim impact evidence during the sentencing phases of a capital trial.").

[61] *Payne*, 501 U.S. at 825 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-183 (1986)).

[62] *See Andrew*, 604 U.S. at 92 (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).

[63] *Id.* at 93 (emphasis omitted).

therefore indispensable to the decision in *Payne*. That means it was a holding of this Court for purposes of AEDPA."[64]

The Supreme Court further opined that "*Payne* did not invent due process protections against unduly prejudicial evidence."[65] The Court cited three other cases for the proposition that it "had several times before held that prosecutors' prejudicial or misleading statements violate due process if they render a trial or capital sentencing fundamentally unfair."[66] Of those three decisions, two held there was no Due Process violation.[67] So holdings failing to find a constitutional violation can clearly establish law just as decisions finding a violation can.

The Court cited a fourth decision,[68] *Kansas v. Carr*,[69] to support its statement in *Andrew* that "the Court relied on *Payne* in the same way that Andrew[, the defendant,] sought to rely on it here: for the proposition that 'the Due Process Clause . . . wards off the introduction of unduly prejudicial evidence that would render the trial fundamentally unfair.'"[70] In *Carr*, the

---

[64] *Id.*

[65] *Id.*

[66] *Id.* (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *Caldwell v. Mississippi*, 472 U.S. 320, 338-40 (1985); *Darden v. Wainwright*, 477 U.S. 168, 178–83 (1986)).

[67] *See Donnelly*, 416 U.S. at 639 (holding a prosecutor's remarks during closing arguments were not sufficiently prejudicial to violate the respondent's due process rights); *Darden*, 477 U.S. at 181(holding counsel's comments during closing arguments did not deprive petitioner of a fair trial). *But see Caldwell*, 472 U.S. at 323 (vacating a death sentence because due process was violated when a "prosecutor urged the jury not to view itself as determining whether the defendant would die because a death sentence would be reviewed for correctness by the State Supreme Court").

[68] *Andrew*, 604 U.S. at 94.

[69] 577 U.S. 108 (2016).

[70] *Andrew*, 604 U.S. at 94 (alteration in original) (quoting *Kansas v. Carr*, 577 U.S. 108, 123 (2016)).

No. 18-70001

Court rejected a due process challenge and upheld a death sentence even though in a joint sentencing proceeding, one defendant's mitigating evidence "put a thumb on death's scale for the other."[71]  Then, the Supreme Court proceeded to cite two additional decisions in *Andrew* for the proposition that "This Court has also relied on the underlying fundamental fairness principle in the jury-impartiality context."[72]

Importantly, neither *Payne* nor any of the other decisions cited by the Supreme Court in *Andrew* dealt with the introduction of evidence of a defendant's sexual activity or the other types of evidence at issue in *Andrew*, and only one of those decisions dealt with an admission of evidence issue.  To reiterate, the Supreme Court held in *Andrew* that "To the extent that the Court of Appeals thought itself constrained by AEDPA to limit *Payne* to its facts, it was mistaken.  General legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court."[73]

The majority opinion dismisses *Andrew v. White*—saying "The 'holding,' [apparently referring to *Payne*, citing 145 S. Ct. at 81] in turn, was directly related to the evidentiary issue presented to the courts."[74]  But as already discussed, *Payne* made only the general statement: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment

---

[71] *Carr*, 577 U.S. at 122.

[72] *Andrew*, 604 U.S. at 94 (citing *Skilling v. United States*, 561 U.S. 358, 384-85 (2010) (holding that the district court did not err in declining to change venue in spite of publicity about the case); *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (holding that due process was violated when the district court denied a change of venue motion in light of a video of the defendant's confession that was widely viewed on television)).

[73] *Id.*

[74] *Ante* at 12.

provides a mechanism for relief."[75]    The majority opinion concludes its dismissal of *Andrew*, by saying it "is inapposite on the facts and the precise legal issue before the Court."[76]

However, *Andrew* addressed more than a particular set of facts or a precise legal issue—there, the prejudicial impact on the defendant's due process right of voluminous evidence about her sex life.  *Andrew* also addressed federal courts' duty to identify and apply well-established principles of law in the AEDPA context.  One such well-established principle of law is that a Sixth Amendment violation can occur if a defendant is deprived of the presence and assistance of his attorney during a critical stage of the prosecution.[77]    Such a principle is no more general than the Supreme Court's holding "that the Due Process Clause can in certain cases protect against the introduction of unduly prejudicial evidence at a criminal trial," which the *Andrew* court observed was clearly-established law for purposes of AEDPA.[78]    To the extent the majority opinion contends that the law must be clearly established that deficiencies of one of two counsel can constitute ineffective assistance of counsel, even if co-counsel at trial was not deficient as to the parts of the trial he conducted, it fails to heed *Andrew*.[79]

---

[75] *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).

[76] *Ante* at 12.

[77] *See, e.g.*, *Geders v. United States*, 425 U.S. 80, 91-92 (1976) (holding that a defendant's inability to consult his counsel "during a 17-hour overnight recess between his direct-and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment").

[78] *Andrew*, 604 U.S. at 93; *cf. id.* at 94-95 (observing that the Eighth Amendment principle that a sentence may not be "grossly disproportionate" to the offense is clearly established law for AEDPA purposes).

[79] *See id.* at 94 ("To the extent that the Court of Appeals thought itself constrained by AEDPA to limit *Payne* to its facts, it was mistaken.").

No. 18-70001

Nor can we forget that *Strickland* was well-established law. Its holdings sufficiently established the guideposts for when counsel's performance is deficient.

**B**

The right to counsel at a critical stage of a criminal proceeding was established long before Alvarez was convicted in 1999.[80] The *Strickland* decision itself said that "In a long line of cases that includes *Powell v. Alabama*,[81] *Johnson v. Zerbst*,[82] and *Gideon v. Wainwright*,[83] this Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial."[84]

The Supreme Court had held in *Holloway v. Arkansas*[85] by the time of Alvarez's trial in 1999, and at the time the TCCA denied Alvarez's sleeping-lawyer claim in September of 2008, that, as quoted earlier, "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense,"[86] a violation of the Sixth Amendment can

---

[80] *See White v. Maryland*, 373 U.S. 59, 60 (1963) (reversing petitioner's death sentence, holding "[w]hatever may be the normal function of the 'preliminary hearing' under Maryland law, it was in this case . . . 'critical'" because a guilty "plea was taken at a time when he had no counsel"); *Hamilton v. Alabama*, 368 U.S. 52, 54-55 (1961) (reversing a death sentence because, though the defendant entered a plea of not guilty at arraignment, that was a critical stage under Alabama law and he did not have counsel).

[81] 287 U.S. 45 (1932).

[82] 304 U.S. 458 (1938).

[83] 372 U.S. 335 (1963).

[84] *Strickland v. Washington*, 466 U.S. 668, 684 (1984) (internal citations omitted).

[85] 435 U.S. 475 (1978).

[86] *Id.* at 489 (citing *Gideon*, 372 U.S. at 335); *see infra* note 150.

46

occur.[87]  Those principles lead to the conclusion that the TCCA's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

The clear statement in *Holloway* cannot be dismissed.  The Court said that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, *reversal is automatic*."[88]  Even if subsequent decisions of the Supreme Court indicate that reversal is not automatic, those decisions did not remotely change the proposition that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense," a violation of the Sixth Amendment can occur.  When Alvarez's lead counsel slept during the direct testimony of witnesses he then cross-examined, Alvarez was deprived of the presence and assistance of his attorney.

Regardless, Alvarez has established that lead counsel's performance was deficient under *Strickland*.  Lead counsel's "representation fell below an objective standard of reasonableness."[89]   No one contends that it is reasonable "under prevailing professional norms"[90] to sleep during witnesses' testimony, and then cross-examine those witnesses.  To the extent that the TCCA concluded lead counsel's sleeping was not unreasonable conduct, that conclusion was "contrary to, or involved an unreasonable

---

[87] *See Holloway*, 435 U.S. at 489.

[88] *Id.* (emphasis added).

[89] *Strickland*, 466 U.S. at 688; *see also Holloway*, 435 U.S. at 489.

[90] *Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Strickland* also "requires showing that counsel . . . was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[91] Sleeping counsel cannot function as counsel while asleep.

## C

Additionally, Alvarez has shown prejudice under *Strickland*. He has shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[92] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[93] The fundamental premise of *Strickland* must also be borne in mind. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."[94]

The witnesses that lead counsel cross-examined at trial and their importance is a matter of record. Lead counsel provided substantially and materially more of the representation at trial than did his co-counsel. During the guilt phase, the State called twenty-seven witnesses.[95] Reyes, who was lead counsel and the sleeping lawyer, cross-examined at least sixteen of them.[96] Of those sixteen witnesses, at least six were bystanders who provided

---

[91] *Id*. at 687.

[92] *Id.* at 694.

[93] *Id.*

[94] *Id.* at 686.

[95] *See* 1RR:22-25 (chronological index of reporter's record listing witnesses).

[96] *See* 17RR:48-60 (Lauritzen cross by Reyes); 17RR:91-106 (Ayala cross by Reyes); 17RR:112-27 (Nava cross by Reyes); 17RR:139-41 (Gonzales cross by Reyes); 18RR:89-110

eyewitness accounts of the murders.[97]  One in particular, Brandy Varela, testified to being only a few feet away when a man with a shotgun approached and killed her boyfriend and brother.[98]  At trial, Varela identified Alvarez as the shooter.[99]  The State also called Miguel Reyes, a member of the Southwest Cholos, who testified to being in the car with Alvarez during the Woodfair drive-by shooting.[100]  Many of the remaining witnesses the sleeping lawyer cross-examined were police officers who investigated the murders and examined the crime scenes.[101]  One of these officers, Sergeant George Alderete, testified to recording Alvarez's confession regarding the Woodfair murders.[102]

During the guilt phase, the defense called four witnesses, three of whom were presented by Reyes.[103]

---

(Carr cross by Reyes); 18RR:167-87 (Brandy Varela cross by Reyes); 19RR:73-90 (Farrel cross by Reyes); 20RR:14-63, 111-38 (Reyes cross by Reyes); 20RR:189-201 (Riddle cross by Reyes); 21RR:65-121 (Alderete cross by Reyes); 21RR:189-212 (Suro cross by Reyes); 22RR:33-73 (Kreuzer-Halling cross by Reyes); 22RR:133-38 (Ogden cross by Reyes); 22RR:142-45 (Burrell voir dire examination by Reyes); 22RR:186-96 (Narula cross by Reyes); 22RR:213 (Aguirre cross by Reyes).

[97] *See* 17RR:27-31 (Lauritzen); 17RR:70 (Ayala); 17RR:108-09 (Nava); 17RR:129-31 (Gonzales); 18RR:145-48 (Brandy Varela); 19RR:51-52 (Farrel).

[98] 18RR:131-67 (Varela direct examination).

[99] 18RR:157-58.

[100] *See* 19RR:182-95.

[101] *See* 18RR:44 (Carr); 20RR:169 (Riddle); 16RR:8-9 (Alderete); 21RR:179 (Suro); 22RR:22 (Kreuzer-Halling); 22RR:127-28 (Ogden); 22RR:139-40 (Burrell).

[102] 21RR:59-60.

[103] 23RR:54-67 (Teresa Alvarez direct by Reyes); 23RR:81-82 (Brandy Varela direct by Reyes); 23RR:83-96 (Patricia Alvarez direct by Reyes).

No. 18-70001

During the sentencing phase, the State called thirteen witnesses.[104] Reyes, the sleeping lawyer, cross-examined nine (all but four) of those witnesses,[105] and the defense declined to question one of the witnesses altogether.[106] Several of the State's witnesses whom Reyes cross-examined testified to witnessing Alvarez commit acts of violence as well as to being victimized by a man who matched Alvarez's description and who was riding in a car similar to one witnesses to the drive-by shootings described.[107] For instance, Thomas Carreon, Jr., a member of a rival gang, was playing basketball with children when he was robbed at gunpoint by someone riding in a red, four-door car.[108] Carreon identified Alvarez as the robber.[109] Alpidio Torres, a witness to a drive-by shooting that occurred on May 31, 1998,[110] corroborated his previous identification of Alvarez from a photospread by identifying Alvarez in the courtroom.[111] Along with these victims, the State also called police officers who investigated the shootings (who were also

---

[104] *See* 1RR:26-28 (chronological index of reporter's record listing witnesses).

[105] 25RR:50-68 (Favela cross by Reyes); 25RR:118-28 (Termeulen cross by Reyes); 25RR:149-66 (Bear cross by Reyes); 25RR:188-200 (Espinoza cross by Reyes); 26RR:11-13 (Baldwin cross by Reyes); 26RR:25-36 (Torres cross by Reyes); 26RR:54-59 (Carreon cross by Reyes); 26RR:114-20 (Hazelwood cross by Reyes); 26RR:140-43 (Anglei cross by Reyes).

[106] *See* 26RR:150 (Reyes declining to question Sandra Varela).

[107] See 25RR:32-49 (Favela); 25RR:130-149 (Bear); 25RR:177-88 (Espinoza); 26RR:13-24 (Torres); 26RR:40-43 (Carreon); 26RR:100-09 (Hazelwood).

[108] 26RR:42-50.

[109] 26RR:43.

[110] 26RR:14, 18-20.

[111] 26RR:23-24.

cross-examined by Reyes).[112] One of these officers described Carreon's identification of Alvarez from a photospread.[113]

During the sentencing phase, the defense called eight witnesses, seven of whom were presented by Reyes.[114]

There is uncontroverted evidence from a juror that Reyes "would do most of his dozing while the prosecutors were questioning their witnesses."[115] Reyes could not effectively cross-examine State witnesses during whose testimony he slept because he could not know what their direct examination elicited while he was asleep. Yet "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."[116] It "is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."[117] Nor could Reyes assess and advise Alvarez about the parts of testimony Reyes did not hear because he was not awake.

There was prejudice aside from how Reyes might have better performed his role as counsel had he not missed parts of the trial while asleep. The fact that he slept when he did severely undermines the confidence that Alvarez received a fair trial. The prejudice from the jarring vision of a

---

[112] 25RR:98-108 (Termeulen); 26RR:5-11 (Baldwin); 26RR:134-35 (Anglei); *see also supra* notes 96, 105 (cross-examinations).

[113] *See* 26RR:134-37.

[114] 1RR:26, 28-29; 27RR:25, 72, 83, 91, 125, 188, 192; 28RR:5. Anthony Thomas was the only defense witness at sentencing not questioned by Reyes. 27RR:5, 22.

[115] ROA.5409 ¶ 8.

[116] *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *see Crawford v. Washington*, 541 U.S. 36, 62 (2004) ("[A]dversarial testing 'beats and bolts out the Truth much better.'" (quoting MATTHEW HALE, HISTORY AND ANALYSIS OF THE COMMON LAW OF ENGLAND 258 (1713))).

[117] *Pointer v. Texas*, 380 U.S. 400, 405 (1965).

sleeping lawyer in the midst of a death penalty trial was apparent, even to a lay person. One juror perceptively identified the fair trial issues: "I don't see how Mr. Reyes could have done a very good job of questioning those witnesses when he would be sleeping during their testimony."[118] His sleeping also powerfully reinforced that juror's conclusion that Reyes "did not seem very invested or involved in the case or his client."[119] The juror additionally stated: "I never noticed him interacting with his client throughout the trial. He did not seem to care much for his client or what was happening during the trial."[120] That juror further recounted:

> Mr. Reyes's lack of interest in general, and his repeated sleeping during the trial, were something we jurors talked about when we were deliberating. When we talked about it, we were concerned about how bad it seemed that here you had a young man, a boy really, whose whole life was in front of him, indeed whose life was literally at stake in this trial, and his lawyer didn't even care enough to stay awake or aggressively fight for him.[121]

The other juror who gave an affidavit similarly said: "Mr. Alvarez's lawyers did not seem prepared, nor did they seem all that concerned about the case."[122] That juror recounted how "shocked" the jurors were when Reyes "repeatedly" fell asleep during trial, and that at least once the judge "had to wake Mr. Reyes up by repeating his name when it was his turn to

---

[118] ROA.5409 ¶ 8.

[119] ROA.5408 ¶ 5; *see also* ROA.5413 ¶ 5 (a different juror stating in an affidavit that "On the defense side, however, all I can say is that the defense did not seem to be motivated to put up any real effort for Mr. Alvarez").

[120] ROA.5408-09 ¶ 5.

[121] ROA.5409-10 ¶ 9.

[122] ROA.5414 ¶ 6.

No. 18-70001

question a witness," which caused the courtroom to break out into "nervous laughter at such a spectacle."[123]  The juror then said:

> When we got back in the jury room the jurors talked about how we couldn't believe that a lawyer like this in a capital case was falling asleep during the trial.  It bothered us, and we commented on it to one another, and it fit with our overall impression that the defense did not really do much of a job of defending their client.[124]

In these circumstances, Reyes's repeated sleeping during trial "undermine[s] confidence in the outcome" of Alvarez's capital trial.[125]

The State argues, apparently for the first time in this court, that we should not rely on these juror affidavits because Rule 606(b) of both the

---

[123] ROA.5414 ¶ 7.

[124] ROA.5414 ¶ 8.

[125] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

No. 18-70001

Federal and Texas Rules of Evidence[126] prohibit considering them.[127]   As noted above, Alvarez offered these affidavits in connection with his first state

---

[126] Federal Rule of Evidence 606(b) provides:

(b) During an Inquiry into the Validity of a Verdict or Indictment.

(1) Prohibited Testimony or Other Evidence.  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions.  A juror may testify about whether:

(A) extraneous prejudicial information was improperly brought to the jury's attention;

(B) an outside influence was improperly brought to bear on any juror; or

(C) a mistake was made in entering the verdict on the verdict form.

Texas Rule of Evidence 606(b) is similar, with slightly different exceptions:

(b) During an Inquiry into the Validity of a Verdict or Indictment.

(1) Prohibited Testimony or Other Evidence.  During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(2) Exceptions.  A juror may testify:

(A) about whether an outside influence was improperly brought to bear on any juror; or

(B) to rebut a claim that the juror was not qualified to serve.

54

postconviction proceeding.[128]  He again attached the affidavits to his federal habeas petition.[129]  The district court relied on them.[130]  Yet the State has not pointed to a single instance in the record of its objection to these affidavits[131]—not in any of the state proceedings, and not in the district court.[132]

In any event, the affidavits were offered as evidence of what happened in open court to establish that Reyes slept during trial.  The affidavits were not offered to show how or why the jurors voted as they did. They are nevertheless evidence of what, from an objective standpoint, occurred in the courtroom.  The affidavits are evidence that a death penalty trial punctuated with lead counsel repeatedly sleeping severely impairs the public perception of the fairness and integrity of the justice system.

Reyes was seen sleeping many times by jurors, for up to five minutes at a time and perhaps longer, during the presentation of the State's case against Alvarez.[133]  The impact on jurors of seeing Alvarez's primary counsel

---

[127] ECF 40 at 24 (State Resp. in Opp'n to Appeal for Certificate of Appealability); ECF 57 at 14 n.10 (State Resp. in Opp'n to Mot. to Expand the R.); ECF 85 at 7 (State Suppl. Merits Br.) (quoting *Young v. Davis*, 835 F.3d 520, 529 (5th Cir. 2016)).

[128] ROA.5263-65, 5408-15.

[129] ROA.9-12, 321, 443-49.

[130] *Alvarez v. Davis*, No. 4:09-CV-3040, 2017 WL 4844570, at *32 (S.D. Tex. Oct. 25, 2017); ROA.3079 (same).

[131] *See* ECF 40 at 24 n.19 (State Resp. in Opp'n to Appeal for Certificate of Appealability) (suggesting that the State made no similar objection in the district court by explaining that the State argued in the district court that the sleeping-lawyer claim was unexhausted and procedurally defaulted).

[132] *See* ROA.2174-75 (Answer to Am. Pet.) (discussing the juror affidavits in district court proceedings without objecting to their inclusion).

[133] ROA.5409 ¶¶ 7-8 ("During the times I saw Mr. Reyes sleeping, he would stay out for periods of several minutes, as long as five minutes or maybe even more on some

asleep while weighty and damning testimony was adduced, and the trial court's failure to take any action, is truly incalculable, particularly with respect to the sentence Alvarez was to receive. The unmistakable message to jurors was that the legal system thought it unimportant that Alvarez have competent counsel when deciding whether he was guilty and, literally, whether he was to live or die.

## D

The TCCA's decision regarding the sleeping-lawyer claim also "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[134] There was no evidentiary hearing in the state habeas proceedings. The State had the opportunity to, but did not, present evidence from other witnesses who were present during the trial. Nor did it claim that there were no other witnesses available due to the passage of time between the trial in 1999 and the initial habeas proceedings in 2008. The evidence in the affidavits from jurors was uncontradicted.

The judge who presided over the trial that resulted in Alvarez's conviction in 1999 was Judge Larry Fuller. He did not preside over the state habeas proceedings. The presiding judge in the state habeas trial court proceedings was Judge Hazel Jones. So, the habeas trial court judge did not have actual knowledge of what occurred at the original trial.

---

occasions, two to three minutes or more on others. . . . As best I can recall Mr. Reyes would do most of his dozing while the prosecutors were questioning their witnesses.").

[134] 28 U.S.C. § 2254(d)(2).

No. 18-70001

The TCCA expressly declined to adopt the state habeas trial court's findings regarding counsel's effectiveness at trial.[135]  The TCCA expressly refused to adopt the following finding by the state habeas trial court:

> 50.  The Court finds, based on the record, that counsel filed numerous pre-trial motions, including a motion to suppress the applicant's statements, conducted pre-trial hearings, had a thorough command of the facts of the offense and relevant law, vigorously cross-examined witnesses, presented witnesses in defense of the applicant at guilt-innocence and punishment, retained an expert witness, made relevant objections throughout the trial, argued passionately for the applicant at both guilt-innocence and punishment, and presented the obvious, reasonable trial strategy of focusing on the punishment phase given the overwhelming amount of evidence implicating the applicant in the instant capital murder.[136]

Sleeping during direct examination of critical witnesses' testimony before cross-examining them is ineffective assistance of counsel that amounts to no counsel at all.  Reyes cross-examined twenty-five of the State's witnesses, which is a substantial majority of the witnesses called by the State. We know that he did "most of" his sleeping during the State's direct examination of witnesses, and that "[h]e would definitely fall asleep, not just a head nod," and "would stay out for periods of several minutes, as long as five minutes or maybe even more on some occasions, two to three minutes or more on others."[137]

---

[135] *See Ex parte Alvarez*, No. WR-62,426-01, 2008 WL 4357801, at *1 (Tex. Crim. App. Sep. 24, 2008) (not designated for publication).

[136] ROA.5941; *see Ex parte Alvarez*, 2008 WL 4357801, at *1.

[137] ROA.5409 ¶¶ 6-8.

57

No. 18-70001

In the face of unrebutted testimony that Reyes slept for substantial periods of time during critical trial proceedings, and in light of the TCCA's rejection of the trial court's finding as to counsel's effectiveness as described above, it is difficult to hypothesize what facts the TCCA could have found that would render denial of the sleeping-lawyer claim reasonable.

**E**

The majority opinion asserts that this case presents a "novel" issue because Alvarez had two lawyers, only one of whom slept.[138]   The unconsciousness of one, as the reasoning goes, can be eclipsed by the effectiveness of the other.

I disagree.   "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'"[139]   "Unconscious counsel equates to no counsel at all. Unconscious counsel does not analyze, object, listen or in any way exercise judgment on behalf of a client."[140]   "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."[141]   The repeated, continuing spectacle of sleeping counsel

---

[138] *See ante* at 20-21; *see also McFarland v. Lumpkin*, 26 F.4th 314, 320 (5th Cir. 2022) ("We are aware of no case where a sleeping co-counsel alone triggers *Cronic*'s presumption of prejudice.  McFarland cannot show that his counsel failed to function in any meaningful sense because, at every stage of trial, he also enjoyed effective assistance by Melamed.  As such, the TCCA's decision is not contrary to or an unreasonable application of clearly established Supreme Court precedent.  The district court properly denied habeas relief as to McFarland's *Cronic* claim."); *Hall v. Thaler*, 504 F. App'x 269, 270, 277 (5th Cir. 2012) (noting that a "presumption [of prejudice] applies where the defendant is completely denied assistance of counsel" and denying a certificate of appealability on a sleeping-lawyer claim because Hall was represented by two attorneys).

[139] *United States v. Cronic*, 466 U.S. 648, 656 (1984) (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)).

[140] *Burdine v. Johnson*, 262 F.3d 336, 349 (5th Cir. 2001) (en banc).

[141] *Cronic*, 466 U.S. at 656-57.

undermined that character of confrontation. In at least one instance Reyes was roused from his slumber when the judge called out his name, as witnessed by the jurors.

To reiterate, I do not contend that a few instances of napping by counsel during trial violate the Sixth Amendment right to counsel. But Alvarez was without counsel during critical parts of the trial. Reyes was indisputably the lead counsel.[142] As discussed above, the state trial court adhered to a general practice in Texas state courts that when one lawyer has responsibility for a witness during a trial, co-counsel cannot interject objections or take over or supplement cross-examination.[143] The fact that co-counsel sat next to Reyes while Reyes snoozed during direct examination of critical witnesses called by the State to testify against Alvarez does nothing to repair or offset or undo the ineffectiveness that occurred while lead counsel slept. During these times, Alvarez suffered "the 'complete denial of counsel'"[144]—not merely the denial "of part of the defense team."[145]

This is not a "novel factual context" like the *physical* absence of the lawyer in *Van Patten* who participated in proceedings via speakerphone.[146] Lead counsel's trial conduct in the case before us can be evaluated under *Strickland*'s long-standing construct.[147]

The fact that co-counsel performed adequately while questioning the witnesses for which he had responsibility does not erase either lead counsel's

---

[142] ROA.5220 (February 2008 supplemental reply).

[143] *See, e.g.*, 19RR:137-38.

[144] *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Cronic*, 466 U.S. at 659).

[145] *Ante* at 20 n.12.

[146] *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

[147] *See Andrew v. White*, 604 U.S. 86, 94 (2025).

deficient performance or the impact that deficient performance had on the outcome of the trial. Co-counsel's performance could not erase the spectacle of lead counsel sleeping during the presentation of State witnesses lead counsel then cross-examined.

## III

I come to the question of whether *Cronic* applies such that prejudice is presumed. In light of the Supreme Court's decision in *Wright v. Van Patten*,[148] the majority opinion mounts an argument that a presumption of prejudice does not apply in the present case. I begin with some of the history regarding a presumption of prejudice when counsel has been deficient or absent.

In 1978, the Supreme Court said in *Holloway v. Arkansas*[149] that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic."[150] In *Holloway*, the trial court "improperly require[d] joint representation over timely objection."[151] The Supreme Court reversed and remanded, declining to impose a showing of prejudice or harm.[152] The Supreme Court concluded that "'[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.'"[153] The Court reasoned that "[j]oint

---

[148] 552 U.S. 120 (2008).

[149] 435 U.S. 475 (1978).

[150] *Id.* at 489 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Hamilton v. Alabama*, 368 U.S. 52 (1961); *White v. Maryland*, 373 U.S. 59 (1963)).

[151] *Id.* at 488.

[152] *Id.*

[153] *Id.* (quoting *Glasser v. United States*, 315 U.S. 60, 75-76 (1942)).

representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing."[154]    Requiring a defendant to show prejudice "in some specific fashion would not be susceptible of intelligent, evenhanded application" under such circumstances.[155]  The Court explained that "to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible," and "would require, unlike most cases, unguided speculation."[156]

In support of the holding quoted above from *Glasser v. United States*[157] that "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial,"[158] the Supreme Court cited *Tumey v. Ohio*.[159]  The Court held in *Tumey* that "[n]o matter what the evidence was against [the defendant], he had the right to have an impartial judge," in response to the argument "that the evidence shows clearly that the defendant was guilty and that he was only fined \$100 which was the minimum amount."[160]  In the present case, there is strong evidence that Alvarez was in fact guilty of murder.

Nevertheless, when a lawyer sleeps through a substantial portion of a trial or a critical phase for which that lawyer has responsibility, such as the direct testimony of State witnesses whom the lawyer will cross-examine, the

---

[154] *Id*. at 489-90.

[155] *Id*. at 490.

[156] *Id*. at 491.

[157] 315 U.S. 60 (1942), *superseded by statute on other grounds*, FED. R. EVID. 104(a), *as recognized in*, *Bourjaily v. United States*, 483 U.S. 171, 181 (1987).

[158] *Holloway*, 435 U.S. at 488.

[159] 273 U.S. 510 (1927); *see also Glasser*, 315 U.S. at 76.

[160] *Tumey*, 273 U.S. at 535.

defendant has no lawyer at all, even if co-counsel is present. As noted, co-counsel is not permitted under well-understood practice in Texas courts to cross-examine jointly or participate jointly in objections when a witness testifies. The state trial court explicitly stated it was following this practice during Alvarez's trial.[161] Accordingly, as in *Holloway*, it would be virtually impossible to assess what decisions the sleeping attorney-in-charge might have made regarding objections, or how the attorney might have challenged or discredited witnesses had the attorney been awake to hear all of the testimony.

Two years before *Holloway* was decided, the Supreme Court held in *Geders v. United States*[162] that preventing a client from having access to his counsel during a seventeen-hour recess overnight in the midst of a ten-day trial required reversal.[163] In that non-capital case, resulting in concurrent sentences of three years of imprisonment, the defendant's direct examination had concluded, and he was cross-examined the next day, after the overnight recess.[164] His counsel had requested but was denied the opportunity to meet with the defendant during the overnight recess and before the defendant retook the stand. Our court had affirmed the conviction on the basis "that petitioner's failure to claim any prejudice resulting from his inability to consult with counsel during one evening of the trial was fatal to his appeal."[165] The Supreme Court reversed and remanded, holding, without requiring a showing of prejudice, that "an order preventing

---

[161] *See, e.g.*, 19RR:137-38 ("Well, I've always agreed that only one lawyer from each side has a right to make objections and not double team.").

[162] 425 U.S. 80 (1976).

[163] *Id.* at 88, 92.

[164] *Id.* at 82-83, 85.

[165] *Id.* at 86 (citing *United States v. Fink*, 502 F.2d 1 (5th Cir. 1974)).

petitioner from consulting his counsel 'about anything' during a 17-hour overnight recess between his direct-and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment."[166]

In 1984, the Supreme Court decided *Cronic*. It was a mail fraud case in which a young, inexperienced attorney had been appointed as counsel for the defendant.[167] The Court recognized that the defendant in the case before it could "make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel," and therefore that the *Strickland* paradigm applied.[168] (The decisions in *Cronic* and *Strickland* issued the same day.) But in the course of its discussion, the Court said in *Cronic*, "[t]here are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."[169]

In *Cronic*, the Court broadly identified at least three kinds of such circumstances, as it later explained in *Bell v. Cone*.[170] "First and '[m]ost obvious' was the 'complete denial of counsel.'"[171] The Court recounted in *Bell* that "[a] trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at 'a critical stage.'"[172] "Second," the *Bell* decision said, "we posited that a similar presumption was warranted if 'counsel entirely fails to subject the prosecution's case to meaningful

---

[166] *Id*. at 91.

[167] *See United States v. Cronic*, 466 U.S. 648, 649-50 (1984).

[168] *Id*. at 666.

[169] *Id*. at 658.

[170] 535 U.S. 685 (2002).

[171] *Id*. at 695 (alteration in original) (quoting *Cronic*, 466 U.S. at 659).

[172] *Id*. (quoting *Cronic*, 466 U.S. at 659).

adversarial testing.'"[173] "Finally," the *Bell* opinion continued, "we said that in cases like *Powell v. Alabama*, [287 U.S. 45 (1932)], where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected."[174]

In *Bell*, the Sixth Circuit had concluded counsel was ineffective during the sentencing phase of a death penalty trial by failing to ask the jury for mercy.[175] The Supreme Court reversed, rejecting the defendant's contention that his counsel's failures fell within the second exception in *Cronic*.[176] The Supreme Court explained that the defendant challenged counsel's performance as failing "to adduce mitigating evidence and the waiver of closing argument."[177] The Supreme Court held that

> [h]ere, respondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind.[178]

Importantly for the present case, a claim that trial counsel slept during significant parts of a trial falls most obviously within the first *Cronic* exception. Sleeping counsel is no counsel at all. A defendant does not have counsel while his lawyer sleeps in open court. As to the second *Cronic* exception, to the extent it applies to a sleeping-lawyer claim, the Supreme

---

[173] *Id*. at 696 (quoting *Cronic*, 466 U.S. at 659).

[174] *Id*.

[175] *Id*. at 693.

[176] *Id*. at 696.

[177] *Id*. at 697.

[178] *Id*.

No. 18-70001

Court observed in *Bell* that the state court was not "objectively unreasonable" when it "deem[ed] counsel's choice to waive argument a tactical decision about which competent lawyers might disagree."[179] Falling asleep during trial is not a *choice*, much less a *tactical decision*. Nor is it a "decision about which competent lawyers might disagree."[180] Tactical decisions and choices are generally governed by *Strickland*. We do not have a tactical choice or decision before us.

At least four circuits—including our own—have held that when a lawyer sleeps through a substantial portion of a trial, that conduct is inherently prejudicial, compromises the reliability of the trial, and violates the defendant's Sixth Amendment right to counsel.[181] Three of those decisions pre-dated *Van Patten*, and the other, *Ragin*, did not distinguish *Van Patten* but instead quoted it: "*Cronic* held that a Sixth Amendment violation may be found 'without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial' when 'circumstances [exist] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'"[182]

In *Burdine v. Johnson*,[183] a capital case, trial counsel "repeatedly dozed or slept as the State questioned witnesses and presented evidence supporting its case against" the defendant.[184] In habeas proceedings, evidence was

---

[179] *Id.* at 702.

[180] *Id.*

[181] *See Tippins v. Walker*, 77 F.3d 682 (2d Cir. 1996); *United States v. Ragin*, 820 F.3d 609 (4th Cir. 2016); *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (en banc); *Javor v. United States*, 724 F.2d 831 (9th Cir. 1984).

[182] *Ragin*, 820 F.3d at 616 n.2 (quoting *Wright v. Van Patten*, 552 U.S. 120, 124 (2008)).

[183] 262 F.3d 336 (5th Cir. 2001) (en banc).

[184] *Id.* at 339.

presented from eight witnesses, including three jurors.[185] The State did not dispute the facts to which they attested, but the State maintained "that because [the state prisoner] cannot demonstrate precisely when [his counsel] slept during his trial, he cannot prove that [his counsel] slept during critical stages of his criminal proceeding."[186] "The State suggest[ed] that because [trial counsel] was physically present in the courtroom, his dozing constituted a form of performance that should be subjected to prejudice analysis."[187] The State also "maintain[ed] that it is impossible to distinguish between sleeping counsel and other impairments that nevertheless have been subjected to prejudice analysis."[188] Our en banc court disagreed.

Our court explained in *Burdine* that, "[a]s recognized by the Second Circuit, 'the buried assumption in our *Strickland* cases is that counsel is present and conscious to exercise judgment, calculation and instinct, for better or worse. But that is an assumption we cannot make when counsel is unconscious at critical times.'"[189] We reasoned, "[w]hen we have no basis for assuming that counsel exercised judgment on behalf of his client during critical stages of trial, we have insufficient basis for trusting the fairness of that trial and consequently must presume prejudice."[190] We continued, "[t]he unconscious attorney is in fact no different from an attorney that is physically absent from trial since both are equally unable to exercise judgment on behalf of their clients."[191] We concluded that "[s]uch absence

---

[185] *Id*.

[186] *Id*. at 347.

[187] *Id*. at 349.

[188] *Id*.

[189] *Id*. (quoting *Tippins v. Walker*, 77 F.3d 682, 687 (2d Cir. 1996)).

[190] *Id*.

[191] *Id*.

No. 18-70001

of counsel at a critical stage of a proceeding makes the adversary process unreliable, and thus a presumption of prejudice is warranted pursuant to *Cronic.*"[192]  The majority opinion distinguishes *Burdine* in a footnote noting that *Burdine* did not involve two defense lawyers.[193]

As indicated above, our decision in *Burdine* relied in part on the Second Circuit's decision in *Tippins v. Walker.*[194]  The *Tippins* decision is eloquent.  Rather than summarize or paraphrase, I quote from it extensively, as follows:

> We are reluctant to extend a rule of *per se* prejudice in any new direction.  Ordinarily, episodes of inattention or slumber are perfectly amenable to analysis under the *Strickland* prejudice test.  And, as respondent argues, there are real dangers in presuming prejudice merely from a lack of alertness. Prolonged inattention during stretches of a long trial (by sleep, preoccupation or otherwise), particularly during periods concerned with other defendants, uncontested issues, or matters peripheral to a particular defendant, may be quantitatively substantial but without consequence.  At such times, even alert and resourceful counsel cannot affect the proceedings to a client's advantage.
>
> However, as the majority reasoned in *Javor* [*v. United States*, 724 F.2d 831 (9th Cir. 1984)], "[p]rejudice is inherent" at some point, "because unconscious or sleeping counsel is equivalent to no counsel at all."  724 F.2d at 834. Effectiveness of counsel depends in part on the ability to confer with the client during trial on a continuous basis, and the attorney must be "present and attentive" in order to make adequate cross-examination—"a matter of constitutional importance" by

---

[192] *Id.* (referencing *United States v. Cronic*, 466 U.S. 648 (1984)).

[193] *Ante* at 21 n.15.

[194] 77 F.3d 682 (2d Cir. 1996).

virtue of the Sixth Amendment. *Id.* Moreover, if counsel sleeps, the ordinary analytical tools for identifying prejudice are unavailable. The errors and lost opportunities may not be visible in the record, and the reviewing court applying the traditional *Strickland* analysis may be forced to engage in "unguided speculation." *Id.* (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1332 (9th Cir.1978) ([e]n banc) (citation omitted), *cert. denied*, 440 U.S. 974, 99 S. Ct. 1542, 59 L.Ed.2d 793 (1979)).

. . .

Although respondent argues that Tippins failed to carry his burden of adducing specific attorney errors resulting in prejudice, we understand Tippins' claim of prejudice to be not that his lawyer should have taken any particular initiative that would potentially affect the result, but that, at critical times, Tippins had no counsel to sort out what initiatives were open. Under these circumstances, where the adversary nature of the proceeding was subject to repeated suspensions, there is little difference between saying that prejudice will be presumed and saying that prejudice has been demonstrated.

We therefore conclude that Tippins suffered prejudice, by presumption or otherwise, if his counsel was repeatedly unconscious at trial for periods of time in which defendant's interests were at stake. Such circumstances implicate a fundamental value that *Strickland* enjoins us to keep in mind:

> A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In

No. 18-70001

> every case the court should be concerned with
> whether, despite the strong presumption of
> reliability, the result of the particular proceeding
> is unreliable because of a breakdown in the
> adversarial process that our system counts on to
> produce just results.

*Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069.[195]

In addition to the Second Circuit, the Fourth and Ninth Circuits have held that because counsel slept during a substantial portion of the defendant's trial, prejudice could be presumed.[196] The Sixth Circuit did not rule out the application of such a presumption in *Muniz v. Smith*,[197] instead concluding that the defendant "cannot establish that his trial counsel was asleep for a substantial portion of his trial" because at most, his counsel "was asleep for an undetermined portion of a single cross-examination."[198] That court observed that the "record shows that Muniz's attorney was not asleep for the entire cross since he objected near the end of the questioning," and that "[t]his is especially significant, given that the total cross-examination

---

[195] *Id.* at 686-87.

[196] *See United States v. Ragin*, 820 F.3d 609, 612 (4th Cir. 2016) (holding "that a defendant is deprived of his Sixth Amendment right to counsel when counsel sleeps during a substantial portion of the defendant's trial," "such conduct compromises the reliability of the trial, and thus no separate showing of prejudice is necessary," and "[t]his case presents such a situation"); *Javor v. United States*, 724 F.2d 831, 833-834 (9th Cir. 1984) (holding "[t]oday we conclude that when an attorney for a criminal defendant sleeps through a substantial portion of the trial, such conduct is inherently prejudicial and thus no separate showing of prejudice is necessary," and that the defendant's "sixth amendment right to counsel was violated not because of specific legal errors or omissions indicating incompetence, but because he had *no* legal assistance during a substantial portion of his trial.").

[197] 647 F.3d 619 (6th Cir. 2011).

[198] *Id.* at 623-24.

69

was fairly short, spanning only 26 pages of trial transcript."[199] The Sixth Circuit concluded that "Muniz's lawyer therefore must have only been asleep for a brief period."[200]

The decisions from the Second, Fourth, and Ninth Circuits support granting relief in this case, and, as already noted, so does our own decision in *Burdine*. However, the Supreme Court's decision in *Woods v. Donald*[201] may counsel against presuming prejudice under *Cronic*. In *Woods*, during a multi-defendant trial, defense counsel for one of the defendants "was briefly absent during testimony concerning other defendants."[202] Counsel had "indicated that the exhibit and testimony did not apply to his client" and after re-entering the courtroom, confirmed to the trial court that "'[Y]es, your Honor, and as I had indicated on the record, I had no dog in the race and no interest in that.'"[203] The Sixth Circuit held that the "attorney provided *per se* ineffective assistance of counsel under *Cronic*."[204] The Supreme Court reversed.

The Court first re-confirmed that "courts may presume that a defendant has suffered unconstitutional prejudice if he 'is denied counsel at a critical stage of his trial.'"[205] The Court also reiterated that in *Bell*, "we characterized a 'critical stage' as one that 'held significant consequences for the accused.'"[206] It would seem that cross-examination of State witnesses in

---

[199] *Id*. at 624.

[200] *Id*.

[201] 575 U.S. 312 (2015).

[202] *Id*. at 313.

[203] *Id*. at 314.

[204] *Id*. at 313.

[205] *Id.* at 315 (quoting *Cronic*, 466 U.S. at 659).

[206] *Id*. (quoting *Bell v. Cone*, 535 U.S. 685, 696 (2002)).

a capital case holds significant consequences for that defendant. However, the Supreme Court chided the appellate court, observing, "[w]ithout identifying any decision from this Court directly [o]n point, the Sixth Circuit concluded that the relevant testimony in this case was 'similar to' our cases applying *Cronic*."[207] The Supreme Court ultimately held, "[a]ll that matters here, and all that should have mattered to the Sixth Circuit, is that we have not held that *Cronic* applies to the circumstances presented in this case."[208] That is a categorical statement.

Nevertheless, there are passages in *Woods v. Donald* that perhaps add context to that categorical statement. First, the Supreme Court characterized "the circumstances presented" as "prosecution testimony *about other defendants*" and "counsel's absence during testimony that is irrelevant within the defendant's own theory of the case."[209] Second, the Supreme Court indicated in *Woods* that the "contours of *Cronic*" may preclude a fairminded jurist from concluding that a presumption of prejudice is unwarranted when counsel is absent for more than a short amount of time during testimony about her own client's theory of the case.[210] The Supreme Court said, "Within the contours of *Cronic*, a fairminded jurist could conclude that a presumption of prejudice is not warranted by counsel's short absence during testimony about other defendants where that testimony was irrelevant to the defendant's theory of the case."[211] Third, the Supreme Court again made clear that "*Cronic* applies in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a

---

[207] *Id.*

[208] *Id.* at 319.

[209] *Id.* at 318-19.

[210] *Id.* at 318.

[211] *Id.*

No. 18-70001

particular case is unjustified.'"[212]  The "Michigan Court of Appeals' refusal to apply [the *Cronic* presumption of prejudice] to these circumstances [where counsel was briefly absent during testimony about other defendants not relevant to his client] was not the 'extreme malfunction' required for federal habeas relief."[213]  I submit that counsel's sleeping during the direct examination of witnesses he then cross-examines is so likely to prejudice the accused that the cost of litigating its effect in a capital case is unjustified.

On the other hand, the Supreme Court also said in *Woods*, "Just last Term we warned the Sixth Circuit that 'where the "precise contours" of [a] right remain "unclear," state courts enjoy "broad discretion" in their adjudication of a prisoner's claims.'"[214]  It is difficult to say with confidence whether the Supreme Court has been clear enough regarding the precise contours of a defendant's right to counsel in a capital case and of *Cronic*'s contours when counsel is absent during witness testimony due to the fact that he is asleep.

Although I see the logic in the decisions from other circuits that have applied *Cronic* in sleeping-lawyer cases, I do not resolve whether *Cronic* applies in the present case.  That is because I conclude there was prejudice.  As discussed above, the proceedings were robbed of their gravity.  The jury could readily conclude that Alvarez's guilt and his fate were foregone conclusions, and that the trial was a hollow process not meant to meaningfully test the prosecution's case or its desired outcome, which was a death sentence.  The proceedings gave the unmistakable impression that Alvarez did not deserve to have a lawyer who could manage to stay awake

---

[212] *Id*. (quoting *Cronic*, 466 U.S. at 658).

[213] *Id*. at 318-19 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

[214] *Id*. at 318 (quoting *White v. Woodall*, 572 U.S. 415, 424 (2014)).

72

during parts of the trial in which he actively participated.  A disengaged, slumbering lawyer was good enough for Alvarez.

## IV

The State argues that granting habeas relief under *Cronic* would violate *Teague v. Lane*[215] because "Alvarez had two lawyers."[216]  The majority opinion agrees in a footnote.[217]  With respect, both are wrong.

Under *Teague*, "[n]ew procedural rules . . . do not apply retroactively on federal collateral review."[218]  A procedural rule is one that "alter[s] 'only the manner of determining the defendant's culpability.'"[219]  "A rule is new unless it was '*dictated* by precedent existing at the time the defendant's conviction became final.'"[220]  "In other words, a rule is new unless, at the time the conviction became final, the rule was already 'apparent to all reasonable jurists.'"[221] On the "flipside," however, "*Teague* also made clear that a case does not 'announce a new rule, [when] it "[is] merely an application of the principle that governed"' a prior decision to a different set of facts."[222]  "Otherwise said, when all we do is apply a general standard to

---

[215] 489 U.S. 288 (1989).

[216] ECF 85 at 5 (State Suppl. Merits Br.).

[217] *See ante* at 20 n.13.

[218] *Edwards v. Vannoy*, 593 U.S. 255, 276 (2021).

[219] *Id.* (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)).

[220] *Id.* at 265 (quoting *Teague* ,489 U.S. at 301).

[221] *Id.* (quoting *Lambrix v. Singletary*, 520 U.S. 518, 528 (1997)).

[222] *Chaidez v. United States*, 568 U.S. 342, 347-48 (2013) (alterations in original) (quoting *Teague*, 489 U.S. at 307).

No. 18-70001

the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes." [223]

The Supreme Court has made clear "that 'the AEDPA and *Teague* inquiries are distinct.'" [224]  That said, the Court has also explained that "'clearly established' law is not 'new' within the meaning of *Teague*." [225] Importantly, AEDPA does not "relieve[] courts from the responsibility of addressing properly raised *Teague* arguments." [226]

If *Cronic* is applied to presume that Alvarez's sleeping lawyer prejudiced his defense, this would not violate *Teague*.  *Cronic* itself, which was decided in 1984, instructs that we should presume prejudice.  This would be a "garden-variety application[]" of *Cronic*'s "general standard to the kind of factual circumstances it was meant to address." [227]

## V

As a procedural matter, I agree with the majority opinion that "there is no indication that the state courts did not adjudicate the sleeping-lawyer claim on the merits." [228]  The federal district court ably explained why it concluded the sleeping-lawyer claim was actually adjudicated by the state courts on the merits and was not dismissed by the state courts on procedural

---

[223] *Id.* at 348.

[224] *Greene v. Fisher*, 565 U.S. 34, 39 (2011) (quoting *Horn v. Banks*, 536 U.S. 266, 272 (2002)).

[225] *Chaidez*, 568 U.S. at 348 n.4 (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J.)). *See generally* Brian R. Means, Postconviction Remedies §§ 26:20, 29:23 (Aug. 2024 update) (discussing relationship between *Teague* and AEDPA).

[226] *Horn*, 536 U.S. at 272.

[227] *Chaidez*, 568 U.S. at 348.

[228] *Ante* at 11.

grounds.[229]  I fully agree with the district court's analysis on this point.  I comment on the analysis because our court expended considerable time ascertaining whether the district court's assessment was correct given the vacillating arguments made by the State and the complexity of the record.

I also note that in our court, the State did not pursue a contention that the sleeping-lawyer claim was procedurally defaulted.  To the contrary, the State argued the merits of the sleeping-lawyer claim.[230]

Our panel queried the parties as to the procedural posture of the sleeping-lawyer claim.  The State's written response explained that it was satisfied that there was no clear factual or legal determination by the federal district court that the state courts had decided the sleeping-lawyer claim on the merits:

> To be sure, the Director argued extensively in the district court that the instant IATC claims were not properly exhausted and procedurally defaulted. *See, e.g.*, ROA.2970–3016.  Those arguments were rejected by the district court.  ROA.3065–69.  Following that decision, the Director evaluated the district court's opinion and found insufficient grounds to appeal the district court's decision.  The district court correctly ascertained the facts and observed that the district attorney responded to the IATC claims raised in Alvarez's reply brief, the trial court considered them validly raised, and the CCA did not explicitly state that the claims were being denied as an abuse of the writ.  ROA.3068.  While the Director obviously would have resolved the issue differently in the first instance, there was no clear factual or legal error that would have justified wasting this Court's time with further litigation.  This

---

[229] *See Alvarez v. Davis*, No. 4:09-CV-3040, 2017 WL 4844570, at *24-25 (S.D. Tex. Oct. 25, 2017); ROA.3065-68 (same). .

[230] ECF 40 at 19-25 (State Resp. in Opp'n to Appeal for Certificate of Appealability); ECF 85 at 3-8 (State Suppl. Merits Br.).

No. 18-70001

is especially true given the district court found that any ineffectiveness claims failed even under de novo review, *see* ROA.3065—the most lenient standard available to the habeas petitioner. The Director therefore saw no need to waste the Court's time litigating an issue that had no ultimate effect on the resolution of the case. In fact, additional litigation on the posture issue would have merely delayed these already lengthy proceedings, again, to the detriment of the Director and Alvarez's victims.[231]

Though neither the state habeas trial court nor the TCCA mentioned the sleeping-lawyer claim expressly in their respective rulings, we should conclude that those rulings were on the merits as to all issues. The posture of this case is similar to that before the Supreme Court in *Johnson v. Williams*.[232] In that case, a state court ruled against the defendant in an opinion that addressed some issues but did not expressly address the federal claim in question.[233] The Supreme Court held that in such a situation, it is presumed, subject to rebuttal, that the state court adjudicated the federal claim on the merits.[234]

## VI

In August 2019, more than eighteen months after this appeal was filed, Alvarez asked this court to consider an affidavit that Reyes, lead trial counsel in the state-court murder trial, executed on August 19, 2019, twenty years after trial. Reyes's affidavit avers that, in 2008, Alvarez's state habeas attorneys asked Reyes if he had slept during the trial, and Reyes "denied it

---

[231] ECF 105 at 14-15 (Resp't-Appellee's Suppl. Br.) (filed January 14, 2022) (footnote omitted).

[232] 568 U.S. 289 (2013).

[233] *Id.* at 292-93.

[234] *Id.* at 293.

was even possible and refused to discuss the matter further."[235] Reyes now states in his affidavit that "it is quite likely that [he] fell asleep during" the trial and that he "would not dispute" the jurors' sworn statements that he did sleep during the trial.[236] He states that he was not telling the truth when he denied the possibility of sleeping during the trial to Alvarez's state habeas attorneys.[237] He further avers that due to his serious medical issues, he has "had similar experiences and effects in other instances, both before Mr. Alvarez's trial and after."[238] Reyes's affidavit also states that prior to the trial, he did not know John Denninger, who was second-chair counsel for Alvarez's trial, and that his "interactions with Mr. Denninger were sparse before and during trial."[239] Further, Reyes did not "recall ever working with [Denninger] outside court during the case."[240]

Alvarez filed a motion in our court to expand the record, to remand to the district court, or in the alternative, to hold the appeal in abeyance to allow him to return to state court to present this new evidence. The majority opinion denies Alvarez's motion.[241]

I agree that we cannot consider the 2019 Reyes affidavit. In *Cullen v. Pinholster*,[242] the Supreme Court held that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that

---

[235] Aff. of Frumencio Reyes at 2 ¶ 8, attached as Ex. A to ECF 53 (Alvarez Mot. to Expand the R.).

[236] *Id.* at 4 ¶ 15.

[237] *Id.* at 4 ¶ 16.

[238] *Id.*

[239] *Id.* at 2 ¶¶ 6-7.

[240] *Id.* at 2 ¶ 7.

[241] *See ante* at 2 n.1.

[242] 563 U.S. 170 (2011).

adjudicated the claim on the merits."[243]  The Supreme Court has therefore made it clear that unless the evidence was presented to the state habeas court, a federal court may not consider it in habeas proceedings in the procedural posture of a case like this one.

However, I would—in the alternative to granting habeas relief based on the record that *was* before the state court—grant Alvarez's motion that we stay proceedings to allow the TCCA to consider the affidavit.

In *Joyner v. King*,[244] this court held that "new factual allegations in support of a previously asserted legal theory" rendered a claim unexhausted, "even though these factual allegations came into existence after state habeas relief had been denied."[245]  In *Graham v. Johnson*,[246] we held that because the petitioner had presented "significant evidentiary support" for his claims that had not been presented to the state court, the claim was not exhausted.[247]  Although *Joyner* and *Graham* were pre-AEDPA cases, we have continued to adhere to this precedent after AEDPA.  In a post-AEDPA case, this court stated that we "have consistently held that a 'petitioner fails to exhaust state remedies when he presents *material* additional evidentiary support to the federal court that was not presented to the state court.'"[248]  We have explained that "the new evidence must be so significant that it

---

[243] *Id.* at 181.

[244] 786 F.2d 1317 (5th Cir. 1986).

[245] *Id.* at 1320.

[246] 94 F.3d 958 (5th Cir. 1996).

[247] *Id.* at 969.

[248] *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (quoting *Graham*, 94 F.3d at 968).

No. 18-70001

'fundamentally alter[s] the legal claim' such that, in fairness, the claim ought to be 'remitted to state court for consideration of that evidence.'"[249]

Here, counsel's affidavit asserts that he was previously untruthful when he denied the possibility of sleeping during trial. He does not now dispute that he slept during trial. He further admits that due to his serious medical issues, he has "had similar experiences and effects in other instances, both before Mr. Alvarez's trial and after."[250] This is material evidentiary support that fundamentally alters the sleeping-lawyer claim such that, in fairness, it should be remanded to state court for consideration of that claim.

Alvarez has moved for a stay in order to exhaust his state remedies, and the Supreme Court has opined that a stay and abeyance is appropriate under certain circumstances.[251] There must be good cause for the failure to exhaust the claim, the claim must not be "plainly meritless,"[252] and the request must not be "for purposes of delay."[253]

I would conclude that there was good cause for the failure to obtain this new evidence because Reyes refused to tell what he now says is the truth until he executed the affidavit at issue. Lead counsel's sleeping during a

---

[249] *Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015) (alteration in original) (quoting *Conner v. Quarterman*, 477 F.3d 287, 292 (5th Cir. 2007)), *abrogated on other grounds by*, *Ayestas v. Davis*, 584 U.S. 28 (2018)).

[250] Aff. of Frumencio Reyes at 4 ¶ 16, attached as Ex. A to ECF 53 (Alvarez Mot. to Expand the R.).

[251] *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

[252] *Id.* (citing 28 U.S.C. § 2254(b)(2)).

[253] *Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 482 (5th Cir. 2023) (citing *Rhines*, 544 U.S. at 277-78).

capital trial is not a plainly meritless claim of ineffective assistance.[254]  The delay in obtaining this new evidence was not due to Alvarez's conduct but instead to Reyes's withholding of what jurors, and now he, says is the truth. Alvarez filed the new affidavit in this court three days after it was signed.  I would therefore conclude Alvarez is entitled to a stay and abeyance of these proceedings so that he may submit his claim to the state courts.

The State argues that the new affidavit is procedurally barred, and thus any reliance on it would be plainly meritless, because the Texas courts will find a subsequent application to be an abuse of the writ.[255]  Although Texas has restrictions on filing subsequent applications, it allows consideration of a subsequent application if that application establishes that the claim could not have been presented in a previous application "because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."[256]  Because it is not clear whether the claim would be barred under Texas law in the present circumstances, I conclude that "Texas courts should make that determination."[257]

Finally, I am satisfied that Alvarez's request is not for purposes of delay.  Alvarez argues that his "prior efforts to pursue these facts in state and federal court show the opposite of dilatoriness" and that "if in either jurisdiction the courts had provided him the formal evidentiary development that he requested, they would likely have been presented long ago."[258]  The

---

[254] *Cf. Burdine v. Johnson*, 262 F.3d 336, 338 (5th Cir. 2001) (en banc) ("When a state court finds on the basis of credible evidence that defense counsel repeatedly slept as evidence was being introduced against a defendant, that defendant has been denied counsel at a critical stage of his trial.").

[255] ECF 57 at 13-14 (State Resp. in Opp'n to Mot. to Expand the R.).

[256] Tex. Code Crim. Pro. Ann. art. 11.071, § 5(a)(1).

[257] *Wilder v. Cockrell*, 274 F.3d 255, 263 (5th Cir. 2001).

[258] ECF 53 at 14 (Alvarez Mot. to Expand the R.).

No. 18-70001

State argues that "Alvarez acted dilatorily in state court during his last federal stay," citing the district court's observation that Alvarez did not immediately file his third state application but instead sought funding to investigate and prepare habeas claims.[259]  The State also argues the "claim is based on a factual predicate that was discovered by Alvarez no later than the time of his state habeas review or . . . could have been found sooner through the use of due diligence."[260]  However, the State apparently agreed in the state trial court that Alvarez would first litigate investigation funding before filing a third state application.[261]  Although that litigation took around a year and ultimately resulted in no investigation funding,[262] the mere fact that Alvarez zealously sought investigation funding before filing a third state application—a process to which the State had agreed—surely cannot now support the State's argument that Alvarez's conduct was dilatory.  The State's second argument is unpersuasive for the same reasons Alvarez has established good cause for the failure to exhaust.

---

[259] ECF 57 at 18 (State Resp. in Opp'n to Mot. to Expand the R.) (citing ROA.3029).

[260] ECF 57 at 18 (State Resp. in Opp'n to Mot. to Expand the R.).

[261] ROA.3280 (Alvarez Sep. 2013 Mot. for Pre-Application Funds for Investigation) ("On September 13, 2013, after the parties had conferred previously, the [state trial] Court held a status conference regarding the appropriate proceedings to follow. It was agreed at this hearing that Mr. Alvarez would file the instant motion [for investigation funding] on or before September 23, 2013, and that a hearing would be held on this motion on Thursday, October 3, 2013.  This motion is being filed in accordance with the agreed schedule."); ROA.3372 (January 2014 trial court order denying funds) (noting the same); ROA.3322 (Alvarez June 2014 TCCA Mandamus Pet. Seeking Funds) (noting the same); ROA.3394-96, 3399 (June 2014 trial court status hearing transcript day after Alvarez filed for mandamus relief) (noting the same, but also noting "the State is frustrated that it has taken this long").

[262] ROA.4473-76 (third state application detailing procedural history of this funding litigation).

No. 18-70001

I would alternatively grant Alvarez's motion to hold the appeal in abeyance.

\*    \*    \*

Because I would grant habeas relief as to the sleeping-lawyer issue, I do not reach any of the other merits issues presented in this appeal. I respectfully dissent from the denial of habeas relief.